## Rudy *versus* Ulrich *et al.*

1 In an issue *devisavit vel non*, on the allegation of undue influence by the mother of an illegitimate child, the legatee in the will, the unlawful cohabitation of the mother with the testator, is not of itself sufficient evidence from which a jury could infer undue influence.

2. The testator had subsequently to the will in controversy executed a paper as a will, in which there was a clause of revocation of former wills; this will had been found invalid in an issue on the ground of undue influence. The court, in this case submitted the question of undue influence as to the clause of revocation, and the jury found there was no undue influence as to the revocation. *Held*, that the paper was not evidence of revocation.

3. The "other writing" in the Wills Act of April 8th 1833, declaring the revocation of a will, is not a will, and need not be proved before the register. *Aliter*, when the revocation is in what purports to be a will disposing of property.

4. The verdict and judgment in the issue on the latter paper being against the will as an entirety, were conclusive in this issue.

5. A will may be contested in whole or in part, and may be void in part and otherwise valid.

6. Dean *v.* Negley, 5 Wright 312, distinguished.

May 18th and 19th 1871.  Before AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Lebanon county*: Of May Term 1871, No. 51.

This was an issue *devisavit vel non*, directed by the Court of Common Pleas under a precept from the register, to try whether a certain paper writing was the will of John Yerkes, deceased. The parties to the issue were Jacob Rudy, guardian of David Yerkes (an illegitimate son of the testator), plaintiff, and Elizabeth Ulrich and Isaac Ulrich, her husband, and Polly Bordner and Isaac Bordner, her husband, the defendants.

Elizabeth Ulrich and Polly Bordner were daughters of the testator.  The will had been lost after the death of the testator.

The first two questions directed by the issue related to the existence and contents of the paper; the others were:

"3. Was the said testator, at the time of the execution of the said last will and testament, of sound mind, memory and understanding?

"4. If any such will was executed, was the same procured by duress, fraud and imposition and undue influence exercised over the mind of said deceased by a woman bearing an unlawful relation to him, or by any other persons?"

The plaintiff proved the existence and execution of the paper at the scrivener's, about three miles from the testator's house, its loss and the contents.

He gave to each of his daughters one dollar, and made the following provisions:—

19 P. F. SMITH—12

[Rudy *v.* Ulrich.]

" I give and bequeath unto my son David, my real and personal estate, which shall be sold by the executor (hereafter provided), who shall pay the money into the hands of a guardian to be appointed for my son David; he shall also have the best bed in my possession, and, if at any time, he becomes competent to manage his own affairs, one-half of the money shall be paid into his own hands; he shall also be put to a place where he will be kept cheapest and best.

" After the death of my son David, the balance shall be equally divided between the children of my daughter Polly, wife of Isaac Bordner, with the exception of Elenorah, who shall have twenty-five dollars more than any of the rest."

This will was made about the 1st of July 1865.

The plaintiff here closed.

The defendants then proved the execution of another paper, dated August 31st 1869, purporting to be the will of the same testator, and offered it in evidence. They proved also, under objection, and in connection with the offer of the paper, that when it was written the testator said that he wished to revoke all other wills—and that he was then of sound mind.

The plaintiff objected to the admission of the paper, because " the will having been filed in court, cannot be given in evidence without giving the whole record, of which it forms a part by being filed."

The court admitted the paper as evidence *per se*, independently of any record, its effect to be determined thereafter. By this will he directed as follows :—

" *Item,* It is my will, and I do order and direct, that my son David and Catharine Rudy shall have all my property, both real and personal, equally among them as long as they both live, and if anything is left after their deaths, then the children of my daughter Polly, wife of Isaac Bordner, shall have the balance equally divided among them.

" The ready money that I have left after my debts are paid shall be used for the purpose of improving the land and house,—that is repairing the house.

"All my personal property shall be sold after my decease, with the exception of one bed, two cows, and two hogs, which shall belong to Catharine Rudy.

" My real estate shall not be sold as long as Catharine Rudy lives.

" I make, constitute, and appoint Jacob Wolf to be the executor of this my last will and testament, hereby revoking all former wills by me made."

The defendants further proved: That the wife of the testator had died seventeen years before; Catharine Rudy (or Kessinger) came to live with him shortly before the wife's death, with two children of her husband Kessinger, who was living; she had a

[Rudy v. Ulrich.]

child, the ward of the plaintiff, born at the testater's house whilst she was living with him, whom the testator recognised as his; this child was about twelve or thirteen years old at the trial; Catharine was about forty years of age; was healthy; the testator was sickly; was over seventy years of age at his death. He often complained that she was after him for his things; sometimes wanted only the half; she wanted him to give it to her or bequeath it to her. He said for the first years they lived as man and wife; said she wanted all his things; that was the cause of their quarrelling; said she wanted him to make a will and give her everything; he would not do it and they quarrelled about that. She was very cross to him; sometimes whipped him; he generally gave up to her; her husband's children lived with the testator. The defendants gave much evidence for the purpose of showing the tyrannical character of Catharine, the testator's fear of her, and the authority and influence she exercised over him. His daughters, the defendants, left home on her account.

The plaintiff then gave in evidence the record of an issue to try the validity as a will of the paper dated August 31st 1869, and the finding of a verdict against its validity. They proved that the issue was tried on the mental incapacity of the testator and undue influence used over him by Catharine Rudy; the case turned on her undue influence.

He also proved that David Yerkes was helpless and idiotic; could not walk or talk, or take his own victuals, which had to be put into his mouth with a spoon, and that there was no prospect of his improvement. The testator's estate was worth about $2800.

During the trial there were a number of exceptions sealed for the plaintiff to the rulings of the court on questions of evidence.

The third point of the plaintiff was:—

"The fact that Catharine Rudy and the testator cohabited together at the time the will was made, as stated by the witnesses— neither of them being then married—is not of itself sufficient to justify the inference that undue influence was used in procuring the will in question, particularly as the testator acknowledged that the beneficiary under the will was his son, who is idiotic and helpless."

Answer: "The fact that these parties lived together in a state of concubinage for some fourteen years, is well calculated to give her great influence over the decedent. This, together with the proof of Kate Rudy's conduct towards Yerkes, is well calculated to show that she had great influence over him, and may very readily have been used to induce him to make a will in favor of her child."

The court (Pearson, P. J.) charged amongst other things:—

"On the 21st day of August 1869, the decedent made another will, containing a clause 'revoking all former wills.' This, the

[Rudy *v.* Ulrich.]

defendants contend, puts an end to the one now set up, executed in 1865. To meet this, the plaintiff shows that on an issue directed and tried in this court and between these parties, that will was found to be invalid, and there is proof that its validity was impeached because procured through the undue influence of Kate Rudy. It was certainly more favorable to her than the present, as it gave her one half of the estate and David the other half. A will may be void in part and otherwise valid, or it may be wholly invalid. If avoided by a judicial decision on account of incapacity of the decedent to make a will, or because not duly executed or proved, it is entirely invalid. If on account of undue influence it may be good for those parts not inserted through that influence, and the other parts avoided. One bequest or devise may be good, when there is no reason to believe it was improperly procured, whilst other parts may be avoided. This doctrine is well settled in the books. Therefore, the clause revoking all former wills may have effect, whilst the bequests of the will may be avoided for undue influence. Whether the intention to make the will in controversy was the unbiassed wish of the testator, or was brought about by the undue influence of Kate Rudy, must be decided by the jury. If she unduly influenced that clause, it will not have the effect to revoke the former will; if it was the uninfluenced wish of the testator, that will is revoked by the very words of the Act of Assembly. If she wanted the will of 1869 made for her benefit and that of her son, and to cut out Yerkes's legitimate heirs, she might very naturally wish to have the other revoked. It is entirely a question of intention, to be determined by the jury."

The verdict was for the defendants.

The plaintiff took a writ of error.

His 6th assignment was the part of the charge given above.

His 7th the answer to his 3d point.

*J. Funck,* for plaintiff in error.—As to the 6th assignment referred to Act of April 8th 1833, § 13, 14 Pamph. L. 257. This statute is to be strictly construed: Clingan *v.* Micheltre, 7 Casey 36; Kauffman *v.* Griesemer, 2 Id. 406; Reid *v.* Borland, 14 Mass. 208. Where a revoking clause is obtained by undue influence, it is no revocation of the former will: Laughton *v.* Atkins, 1 Pick. 535; Price *v.* Maxwell, 4 Casey 39; O'Neal *v.* Farr, 1 Rich. 80.

*D. Fleming* (with whom was *C. P. Miller*), for defendants in error.—As to the 6th error cited: Beard *v.* Beard, 3 Atk. 72; 4 Kent's Com. 590; 1 Jarman on Wills, 154 and cases cited. 1 Williams on Ex'rs 141; Boudinot *v.* Bradford, 2 Dallas 268; Ellis *v.* Smith, 1 Ves. Jr. 17; Jones *v.* Murphy, 8 W. & S. 275; 1 Redfield on Wills, § 33, 37; Barksdale *v.* Hopkins, 23 Georgia 332.

[Rudy v. Ulrich.]

The opinion of the court was delivered, May 25th 1871, by

SHARSWOOD, J.—This was an issue of *devisavit 'vel non* in the Court of Common Pleas on the precept of the register, before whom the copy of a paper-writing, alleged to have been lost, was propounded for probate as the will of John Yerkes, deceased. Ten errors have been assigned. We think that none of them have been sustained except the sixth and seventh. It will be unnecessary to consider the remaining assignments in detail. They present no questions which have not already been decided in McTaggart v. Thompson, 2 Harris 154, and Dean v. Negley, 5 Wright 312.

The plaintiff, however, was entitled to a direct affirmative answer to his third point. It was true, and the jury should have been so instructed, that the fact of the unlawful cohabitation of Catharine Rudy and John Yerkes was not, standing by itself without other evidence, sufficient to justify them in drawing the inference, that undue influence had been used by her to procure the execution of the will in question. However it might have been if the entire property or the bulk of it had been bequeathed or devised to Catharine Rudy, and John Yerkes's own children disinherited in her favor—which was the state of the case in Dean v. Negley— yet the alleged will in this case was not of that character. John Yerkes undoubtedly believed David to be his own child, whatever the fact was. He always treated him as such, and calls him so in this paper. He was an idiotic, helpless boy—incurably so, beyond all hope of amendment—appealing, therefore, most strongly to every feeling of the heart of the parent to make such provision for the support and comfort of an unfortunate being whom he had been instrumental in bringing into the world. His estate was not large: real and personal it was only $2800; the interest of which, after deducting necessary charges, was not more than was required for this purpose. His other children were grown up, in the full enjoyment of their faculties—married and settled in life, and able to do for themselves. He directed the amount of his estate to be paid into the hands of a guardian to be appointed for his son, and if his son became competent to manage his own affairs one-half to be paid into his own hands, and after his death the balance to be equally divided between grandchildren—the children of his daughter Polly. It was a most reasonable, just and proper will under all the circumstances. Catharine Rudy had no personal interest in it, further than her natural affection for her child might prompt her to desire that some provision should be made for him. If she had brought it about by the influence of argument and persuasion, without the employment of undue means, it would have been unimpeachable on the mere ground of the unlawful relation she bore to the alleged testator. She could derive no interest from the bequest, except so far as it went to relieve her from the obliga-

[*Rudy v.* Ulrich.]

tion of support. No court would have appointed her the guardian without requiring from her ample security. The presumption of undue influence did not therefore arise, as it would have done had the testament been clearly *inofficiosum*. The answer of the learned judge to the plaintiff's third point implied indeed that it was correct—but we think the plaintiff was entitled to an express affirmance of it. What was said in answer to it might with great propriety have been added as a qualification or explanation—that the relation Catharine Rudy bore to the alleged testator was well calculated to give her great influence over him, and, together with the evidence of her conduct towards him, might induce the belief that it had been unduly exerted in favor of her child.

We are of the opinion that the instrument dated August 31st 1869, was not evidence to the jury of revocation of the will now in contest, executed in 1865. It was no doubt rightly admitted when it was offered, objected to and bill of exceptions sealed. It was offered, for all that then appeared, as a valid subsequent will, revoking all prior wills, and of course that in regard to which the issue on trial was awarded. No one can well doubt its admissibility in evidence at that time. But when the plaintiff in rebuttal had produced the record of the former issue, directed by the Register's Court to try its validity, and the verdict and judgment against that instrument, in which these defendants were the parties contesting it, it was no longer available for the purpose for which it had been introduced, and the jury should have been so instructed.

It may be freely conceded that admission to probate by the register was not necessary to give effect to the instrument of 1869 as a revocation of that propounded as the will of 1865. Otherwise the question between two wills could never be tried. It would be a race which could first be presented for probate. In the issue on either, the claimants under the other could be admitted to contest; and those under the second could undoubtedly set it up against the first, and the claimants under the first could impeach its validity. The Act of Assembly of April 8th 1833, §§ 13, 14, Pamph. L. 250, provides in effect that no will in writing shall be repealed otherwise than by some other will or codicil in writing, or by other writing declaring such repeal, executed and proved in the same manner as is provided in the case of an original will. There are two modes of revocation here pointed out, besides cancellation, obliteration, &c. First: another subsequent will or codicil duly executed and proved; and second, some other writing declaring the revocation. It is implied that this other writing is not a will, that is, an act of disposition or declaration of what a man intends as to his property after his death. There may be a separate written revocation, not intended to take effect as a will or codicil, which need not therefore be propounded to the register for pro-

[Rudy v. Ulrich.]

bate. This is a very reasonable provision. A man may be absent from home at a distance from the place where his will is deposited, or it may be lost or mislaid, so that he cannot have access to it to cancel or destroy it. He may wish, however, simply to abrogate it without making another will, and so die intestate. In such case he may execute a paper declaring his intention, which provided it is signed by him and proved by two witnesses will be effectual. No probate of it in the register's office is necessary. No letters testamentary or of administration *cum testamento annexo* are required to be issued upon it. But the case is different when the revocation is contained in what purports to be a will disposing of property. The words of the act point to this: " other writing," that is, writing other than a will. A subsequent will without a revoking clause as effectually repeals a prior will as with one. No doubt, as stated by the learned judge below, a will may be void in part and otherwise valid, or it may be wholly invalid. One bequest or devise may be good, whilst other parts may be avoided. But then it stands as a will for those parts which are good. A will propounded for probate may be contested in whole or in part. Had Catharine Rudy obtained possession of the paper, and fraudulently inserted a clause in her own favor, the jury on the issue of *devisavit vel non* could have found against that clause, but that with that exception it was the will of John Yerkes. The paper would then have stood as his will, and by its own force, with or without a revoking clause, would have revoked all wills prior in date. The difficulty in the way of the application of the principles stated by the learned judge to the case in hand is twofold, in part technical and in part substantial. First: The verdict and judgment in the former issue were against the will of 1869 as an entirety, and, standing, unreversed, conclusive in this proceeding. The question of undue influence in obtaining that will, whether in whole or in part, could not be tried over again on this issue. Had it been found that any part of that paper was valid, not only the revoking clause but the appointment of the executor and the power of sale, it would establish it so far as a will, and overturn the former finding. If good as a will at all by the Act of 1833, it revoked the former will. This is the technical difficulty. The substantial one is still more serious. It cannot be known with any degree of assurance, sufficient to justify a legal judgment, that where there is a clause of revocation in a will making a certain disposition of property, that the testator really intended to revoke a prior will making a different disposition, except for the purpose of substituting in place thereof that contained in the second will. It would be making the testator die without any will at all, when it was clearly his intention, as drawn from his executing a paper purporting to be a will, not to do so. In Ex parte Ilchester, 7 Ves. Jr. 348, the appointment of a guardian was

[Rudy *v.* Ulrich.]

revoked, and another guardian appointed by a will not executed according to law. By the English statute a guardian may be appointed either by deed or will. The Master of the Rolls, Sir William Grant, said: "There can be no doubt that part of the intention was to revoke the appointment. But the question is, whether that was the substantive direct object, or only as an incidental and necessary part of the ultimate object, and, whether it would ever have been entertained except with reference to that." And again: "I cannot conceive how an instrument inoperative in its direct purpose can give effect to an intention of which I know nothing but by that purpose." The soundness of this reasoning was acknowledged and applied by the Supreme Court of Massachusetts in a case of an instrument set aside and refused probate as a will, on the ground of undue influence: Laughton *v.* Atkins, 1 Pick. 535. It has been found, and indeed is conceded, that undue influence produced the will of 1869. To make it effectual, it was deemed necessary expressly to revoke all former wills not in order, that John Yerkes might die intestate, but in order to make way for that paper as an effective will. If that paper had been able to maintain its ground as a will, it would have repealed the will of 1865 without any revoking clause. It would have stood as the last declaration, complete in itself, and not an addition or codicil to any former instrument, of what disposition John Yerkes willed to be made of his property after his death. No revoking clause could make it stronger. If it was a will in whole or in part, it was his last will so declared to be, which necessarily overrode all prior ones. We know, however, that express clauses of revocation are inserted in most wills as a mere matter of form, the mere expression of which is inherently implied, as are many other parts, such as the direction that all just debts and funeral expenses shall be first paid and discharged. As evincing an intention on the part of John Yerkes to die intestate unless the will of 1869 went into effect, that paper—executed as it has been found under undue influence—the very act of execution not the free exercise of his own volition—was no ground upon which any legal judgment could be rested. The parol evidence of what took place at the time of the execution of the paper of 1869, did not help the case of the defendants. It had no tendency to show that unless that paper stood he wished only his lawful issue to have his property, according to the intestate laws, leaving his unfortunate illegitimate child wholly unprovided for. All that he said was that he wanted to make another will. If the execution of that paper was induced by the undue influence of Catharine Rudy, there is some difficulty in comprehending why this declaration made in her presence, and with the same view, is not within the same objection. There was no evidence to submit to the jury, either in the paper itself or any declaration made by him at the

[*Rudy v. Ulrich.*]

time that John Yerkes had any other object in revoking the will of 1865, than to substitute the disposition made by the will of 1869 for it. He had no intention to die intestate, but the contrary. The case of Barksdale *v.* Hopkins, 23 Georgia 332, relied on by the counsel for the defendants, is not to the point, and does not sustain his contention. It holds merely that if a will is before a probate court for probate, and a second will is pleaded as a revocation of the first, the probate court may take notice of the second, although it may be that the second is one which has not been admitted to probate, and one which is not offering itself for probate: consequently the probate court may hear proof touching the execution of the second. That is a proposition, it seems, too clear to be doubted, but it has no application to the present case.

We conclude, therefore, that the learned judge below erred in submitting to the jury the instrument called the will of 1869 as evidence of the revocation of that of 1865, which was the subject-matter of the issue.

Judgment reversed, and *venire facias de novo* awarded.