399 A.2d 98

**ESTATE OF Rebecca Roberts SHELLY, Deceased.**

**Appeal of G. ROBERTS et al., Heirs at law.**

Supreme Court of Pennsylvania.

Argued Jan. 18, 1979.

Decided March 14, 1979.

Reargument Denied April 10, 1979.

William L. Huganir, Norristown, for appellant.

Arthur M. Cooper, Asst. Atty. Gen., Philadelphia, M. Paul Smith, Raymond Pearlstine, David M. Jordan, Norristown, for appellee.

Before EAGEN, C. J., and ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Rebecca Roberts Shelly died in 1971. She left two testamentary instruments, one executed in 1965 and another in 1969. Both testamentary writings made substantial gifts to "Peter S. Anthony" and named the Roberts Shelly Foundation, a charitable institution established by decedent in 1955, as the residuary beneficiary.

In a previous litigation, decedent's 1969 instrument was found invalid due to alterations and was denied probate. *Estate of Shelly*, 463 Pa. 430, 345 A.2d 596 (1975). In the present litigation, the heirs of decedent seek to void her 1965 will, contending in separate petitions (1) that the 1965 instrument was revoked and (2) that the 1965 will is invalid by reason of undue influence, insane delusion and unlawfulness of purpose. The charitable beneficiary and the Attorney General of the Commonwealth of Pennsylvania, as parens patriae, opposed the petitions.

On February 18, 1977, the Court of Common Pleas of Montgomery County, Orphans' Court Division, entered a decree upholding the decision of the hearing judge that decedent's estate would pass under the 1965 will. The heirs appealed. We conclude that their claims are meritless, and affirm the decree of the orphans' court.[1]

---

1. We hear this appeal pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1978).

 Appellants in their Brief also suggest that the appointment of a trustee ad litem to represent the charitable Roberts Shelly Foundation was improper. It appears, however, that appellants do not frame any question to this Court, allege any prejudice, or request any specific relief on this ground. In any event, we are satisfied that given the absence of a timely appearance by the Attorney General the appointment of a trustee to protect the interests of the unrepresented charity was a proper exercise of the court's discretion in advancing a just and orderly administration of the estate. Section 2, R. 1, S.Ct.Orph.Ct.R.

## I

Decedent, a long-time member of the Montgomery County Bar, was eighty-three years of age at the time of her death. The record reveals that she signed both her 1965 and 1969 instruments as "Rebecca R. Anthony," falsely representing "Peter S. Anthony" to be her husband. The fictitious "Peter S. Anthony" was in reality Peter Pallitto, a man nearly forty years younger than decedent. At all relevant times Pallitto was married to another woman and resided in Atlantic City, New Jersey. Since at least 1964 decedent had been filing federal income tax returns as "Rebecca R. Anthony" jointly with her spurious husband (hereinafter called "tax spouse"). This misrepresentation produced significant reductions in her tax payments.

In her 1965 instrument decedent gave to her "tax spouse" a lifetime interest in the income from a marital deduction trust, with a power of appointment over the trust property, and a life tenancy in the rest of the estate. In her 1969 instrument she sought to give him a life tenancy in the income from the great bulk of her estate. In both instruments decedent designated the Roberts Shelly Foundation as the residuary remainderman. The 1969 writing included a clause revoking all prior wills.

## II

The orphans' court held that in accordance with the doctrine of dependent relative revocation the effectiveness of the revocation clause in decedent's 1969 writing was contingent upon the validity of that writing. Because the 1969 instrument was previously held invalid due to alterations, the orphans' court held that the 1965 will had not been revoked. Appellants, however, claim that in 1969, before making any alterations, decedent executed a separate and valid will which, although not now in existence, revoked the

Appellants' further claim that the hearing judge improperly considered the caveats to the 1965 will before deciding the question whether the 1969 instrument revoked that will is without merit. In light of the court's adjudication that the 1969 writing did not revoke the 1965 will, appellants were not prejudiced by this procedure.

1965 will. Appellants also argue that the invalid 1969 instrument revoked the 1965 will under Section 2505 of the Probate, Estates and Fiduciaries Code,[2] and alternatively, that the doctrine of dependent relative revocation is inapplicable.

The hearing judge rejected appellants' contention that in 1969 before making alterations decedent signed a valid will. The court did find that in 1969 decedent's attorney sent to her a draft of a new will and that without discussing its terms she told her attorney by phone that she signed the will. It cannot be said on a record bare of documentary proof that the court erred in refusing to find that decedent initially executed a valid revoking will in the form sent to her by her attorney.[3]

**2.** Act of June 30, 1972, P.L. 508, § 2, 20 Pa.C.S.A. § 2505(2), formerly Act of April 24, 1947, P.L. 89, § 5, 20 P.S. § 180.5.

**3.** It certainly does not follow, as appellants contend, that because the 1969 will was finally denied probate "by reason of alterations" it was preceded by a valid 1969 instrument effectively revoking the 1965 will. There is nothing in the prior determination which would support appellants' position.

The hearing judge in the present litigation initially found that decedent signed the 1969 instrument after the alterations were made. The court later revised that finding:

"Louis C. Washburn, Esq., who had prepared the 1969 Will of Decedent, mailed the same to her, with two carbon copies, at her residence on September 11, 1969. On September 17, 1969, Mr. Washburn was informed by Decedent over the telephone that she had signed the Will on or about September 12th. He urged her to forward the original to his office for safekeeping. She said she would, but never did. Mr. Washburn had never seen her 1965 Will and he never again saw the 1969 document in her lifetime. When duplicate originals of the 1969 instrument were presented to the Register of Wills for probate, both had been signed 'Rebecca R. Anthony' by Decedent. These counterparts, which were identical in all respects, revealed that changes had been made in the document, portions had been re-typed and they had been put back together with mixed ribbon and carbon copy pages."

Thus the hearing judge was unable from the record to draw a conclusion about the nature of a writing, if any, which may have preceded the alterations, and observed:

"Whether [decedent] made the alterations before or after she signed the instrument, nobody knows. . . . All the evidence subsequently placed on the record, regardless of what our hopes might be, fails to show exactly what happened after Mrs. Shelly

We now consider section 2505 and our case law dealing with dependent relative revocation to determine the propriety of the court's decision that decedent's invalid 1969 writing did not revoke her earlier 1965 will.

■ Appellants contend that under section 2505(2) the 1969 instrument, even if invalid, was adequate to revoke the 1965 will. Section 2505 provides:

"No will or codicil in writing, or any part thereof, can be revoked or altered otherwise than:

"(1) Will or Codicil. By some other will or codicil in writing;

"(2) Other writing. By some other writing declaring the same, executed and proved in the manner required of wills; or

"(3) Act to the document. By being burnt, torn, cancelled, obliterated, or destroyed, with the intent and for the purpose of revocation, by the testator himself or by another person in his presence and by his express direction. If such act is done by any person other than the testator, the direction of the testator must be proved by the oaths or affirmations of two competent witnesses."

See *McCaffrey Will,* 453 Pa. 416, 419, 309 A.2d 539, 541 (1973) ("a will can be revoked *only* by one of the methods authorized by the statute"). Because the 1969 instrument was denied probate due to intrinsic defects we hold it was not "executed and proved in the manner required of wills" and hence does not satisfy section 2505(2).

In *Gray Will,* 365 Pa. 411, 76 A.2d 169 (1950), the Court suggested in dictum that an ineffective will might constitute an "other writing" for purposes of the Wills Act. The Court

received the ribbon copy and the two carbons in the mail from Mr. Washburn. When she told him that she had signed 'the will', he understood her to mean that she had signed the ribbon copy. This is by no means certain, however, because she might have been referring to one or both of the carbon copies. We are also completely in the dark as to the condition of the Will or Wills when she signed the two instruments. Whether she signed the instrument prior to her attaching the revocatory statement to the front of her Will or whether she attached the revocatory statement first, we do not know."

did not, however, intimate that a will which was found invalid due to a defect in the instrument itself could ever revoke a prior will. Although there are cases in which an ineffective will has been used to show that a prior will was not revived by the revocation of a subsequent will, the ineffective instrument did not suffer from any defect which deprived it on its face of a valid existence. See *Burtt Will*, 353 Pa. 217, 44 A.2d 670 (1945) (though subsequent will containing revocation clause was cancelled after execution, that cancelled will established that no revival of earlier will took place); *Ford's Estate*, 301 Pa. 183, 151 A. 789 (1930) (where 1927 will revoked by physical act leaving a torn document and where executed carbon of 1926 will denied probate because original was not found and therefore was presumed revoked, both writings used to show that 1924 instrument was not revived by revocation of 1927 will). Here an intrinsic defect was found to exist in the 1969 writing. It must be concluded therefore that the 1969 instrument was not under section 2505(2) "some other writing" capable of revoking decedent's will.

■■■■ Decisions of this Court applying the doctrine of dependent relative revocation also compel this result. They hold that where a testamentary disposition fails because of a defect in the instrument itself its revocation clause is inoperative.

> "[The authorities] all recognize a clear distinction between failure of the dispositive part of the revoking instrument because of a defect in the instrument, and failure because of extrinsic circumstances; and there is entire concurrence of view that in the former case the revocation is inoperative, while in the latter it must prevail."

*Melville's Estate*, 245 Pa. 318, 323, 91 A. 679, 681 (1914); accord, *Braun Estate*, 358 Pa. 271, 275, 56 A.2d 201, 203 (1948) (where codicil invalid due to a "defect intrinsic to the instrument" there was no revocation of former will).[4] Here,

4. Where specific bequests in a subsequent will fail for some reason other than a defect rendering that will invalid, this Court has refused to apply the doctrine. E. g., *McClure's Estate*, 309 Pa. 370, 165 A. 24

decedent's 1969 instrument was previously held defective, infirm and invalid as a testamentary writing. The 1969 writing was therefore inoperative under the doctrine of dependent relative revocation as well as under the Decedents, Estates and Fiduciaries Code.

The application of the doctrine of dependent relative revocation here reflects the basic view, supported by our precedents, that decedent did not intend to revoke her prior will unless her subsequent will was a valid one. *Braun,* supra; see *Holt Estate,* 405 Pa. 244, 174 A.2d 874 (1961); *Rudy v. Ulrich,* 69 Pa. 177, 183–84 (1871) (Sharswood, J.); cf. 79 Am.Jur.2d, *Wills* § 563, p. 675 (1975).[5] The record here establishes clearly that decedent did not intend to die intestate. Further, the 1965 and 1969 instruments both expressly demonstrate a desire to benefit decedent's "tax spouse" during his life with a remainder to the Shelly Foundation. To hold that the 1965 will was revoked by the invalid 1969 writing would be to create, contrary to decedent's expressed intention, an intestacy by which decedent's estate would pass to those who would have been excluded under either her 1965 or 1969 disposition. It would also result in depriving the Roberts Shelly Foundation named as residuary bene-

(1933) (where charitable bequest in later will fails but where will is valid, earlier will was revoked); *Teacles Estate,* 153 Pa. 219, 224, 25 A. 1135, 1136 (1893) (where "bequests fail, not [because of] infirmity of the instrument, but from the incapacity of the legatees to take," later will revokes earlier will); *Price v. Maxwell,* 28 Pa. 23, 39 (1857) ("where the second devise fails by reason of a defective execution of the second will, it is no revocation of the first . . .; but where it fails from want of capacity in the devisee to take the prior devise is revoked . . . .").

5. The Court observed in *Holt Estate*:
"It is clear . . . that (1) the doctrine as applied by our Courts is primarily a rule of testamentary construction which is used as an aid in ascertaining the intent of the testator, and (2) the doctrine has been applied only where there is (a) either a defective execution of a subsequent will or codicil or (b) an intrinsic defect in the subsequent will or codicil. However, where the revoking instrument is in itself valid and operative but the subsequent disposition fails for some extrinsic reason such as the incapacity of the devisee to take, the revocation nevertheless remains effective."
Id., 405 Pa. at 251, 174 A.2d at 877 (footnotes omitted).

ficiary in both writings the benefit of decedent's charitable bequest.

## III

Appellants argue on appeal from the probate of decedent's 1965 will that in the circumstances of this case appellees had the burden of proving that decedent's "tax spouse" did not exert undue influence upon her at the time she made her will. They also argue that the evidence requires the conclusion that she was suffering from an insane delusion. We disagree.

### A.

■ Our cases clearly hold that the burden of proving undue influence is on the contestants in the first instance. To shift the burden of undue influence to the proponents of a will the contestants must first establish by clear and convincing evidence

> " 'that 1) when the will was executed the testator was of weakened intellect, and 2) that a person in a confidential relationship with the testator 3) receives a substantial benefit under the will.' "

*Estate of Ziel,* 467 Pa. 531, 541, 359 A.2d 728, 734 (1976) (quoting *In re Estate of Fickert,* 461 Pa. 653, 657, 337 A.2d 592, 594 (1975)). If the above requirements are established, then the burden shifts to the proponents of the will to show that no undue influence occurred. E. g., *Estate of Ziel,* supra.

Based, inter alia, on substantial evidence of decedent's unweakened intellect, her dominant character, her able handling of an investment portfolio valued at about one million dollars, and her abhorrence of federal taxation as reflected in letters to her attorneys, the hearing judge found that decedent falsely represented "Anthony" to be her spouse "as a tax evasion device." [6] The finding that decedent's intellect was not weakened is supported by the testimony of four

---

6. The evidence before the hearing judge also revealed that in her 1969 federal income tax return decedent claimed an additional ex-

persons familiar with her in her last years, including friends and the attorney who in 1969 drafted a will for her. There is no evidence whatever that any marriage took place. Decedent purported to be married when executing her tax evasion scheme.

The record thus shows that this is not a case in which a younger man took advantage of an elderly woman; rather, it is a case in which a sophisticated, capable, and legally trained woman, despite a genuine affection for the younger "tax spouse," used the association to advance her own tax evasion objectives.[7]

 Because the hearing judge found that decedent did not suffer from a weakened intellect, the burden of proving undue influence remained upon appellants regardless of whether a confidential relationship existed between decedent and her "tax spouse." The hearing judge further concluded that appellants failed to meet that burden. Findings of fact of a hearing judge, like the verdict of a jury, will not be disturbed on appeal absent an error of law or an abuse of discretion. E. g., *Estate of Ziel,* 467 Pa. 531, 536–37, 359 A.2d 728, 731 (1976); *In re Estate of Fickert,* 461 Pa. 653, 337 A.2d 592 (1975); *Abrams Will,* 419 Pa. 92, 213 A.2d 638 (1975); 4 D. Hunter, *Orphans' Court,* Orphans' Court § 17(a), p. 393–94 (1959). On the record before us, we find no basis for disturbing the court's findings.

### B.

 Appellants further contend that the hearing judge erred in failing to find that decedent's 1965 will was

emption for the then forty-two year old "tax spouse" on the ground that he was over sixty-five years of age.

7. Indeed, the record shows that her generosity toward her "tax husband" was bounded by a shrewd and businesslike mind. On one occasion when she placed about $30,000 worth of securities in the name of "Peter S. Anthony," she not only obtained a general power of attorney giving her control over the securities but she also kept them in a safety deposit box to which he had no access.

The hearing judge also found that decedent, a religious fundamentalist who had the custom of writing her prayers as "Letters to God," genuinely desired to save the soul of her "tax spouse."

based on an insane delusion that she was married. The burden of proving that testator suffered from the claimed insane delusion was also upon the appellants. *Duross Will,* 395 Pa. 492, 496, 150 A.2d 710, 713 (1959). The hearing judge found that decedent's invention of her marriage to Peter Pallitto was motivated by her deliberate purpose to evade federal taxes and did not arise as a figment of a deluded imagination. We find no basis for disturbing the court's determination that appellants, here again, failed to meet their burden of establishing the claimed insane delusion.

## IV.

Finally we must consider appellants' claim that decedent's 1965 will is invalid because the provision favorable to "Peter S. Anthony" (Peter Pallitto) was part of a criminal tax evasion scheme. Peter Pallitto died in 1973. The record shows no claim by Pallitto during his lifetime as a beneficiary of decedent's estate, and no claim on behalf of his heirs or estate. We are therefore not concerned with the enforceability of a testamentary gift to him. Even if the gift to him were assumed to be unenforceable, section 2514(10) of the Decedents, Estates and Fiduciaries Code, 20 Pa.C.S.A. § 101 et seq.,[8] provides that a gift which is contrary to law fails and passes instead to the residuary beneficiary under decedent's will. See *Jull Estate,* 370 Pa. 434, 88 A.2d 753 (1952). Here it is clear that, even assuming the gift to Pallitto may be void as unlawful, decedent's clearly expressed intention was to benefit the charitable Roberts

8. Section 2514(10) states:

"(10) Lapsed and void devises and legacies; shares not in residue. A devise or bequest not being part of a residuary estate which shall fail or be void because the beneficiary fails to survive the testator or because it is contrary to law or otherwise incapable of taking effect or which has been revoked by the testator or is undisposed of or is released or disclaimed by the beneficiary, if it shall not pass to the issue of the beneficiary under the provisions of clause (9) hereof, and if the disposition thereof shall not be otherwise expressly provided for by law, shall be included in the residuary devise or bequest, if any, contained in the will."

Shelly Foundation as residuary beneficiary. That intention is effectuated by the decree of the orphans' court.

The decree of the orphans' court is affirmed. Each party pay own costs.

O'BRIEN, J., did not participate in the consideration or decision of this case.