52

## Michalski Will

*Dawson H. Muth*, for proponent.
*E. Jay Tract*, for Rosemary E. Sands.
*Russell J. LaMarca*, for Bernard T. Michalski.

OPINION BY WESNER, J., SEPTEMBER 23, 1980:

This matter is before the court on appeal by Rosemary Sands and Bernard Michalski from the decree admitting to probate the will of Leon Michalski. The contestants, adult children of the decedent, charge that decedent lacked testamentary capacity at the time the will was executed and that the will was procured by undue influence of Barbara Medaglia, proponent of the will, daughter of the testator, and sole beneficiary. Hearings on the matter were held on June 27, 1979, June 28, 1979, August 24, 1979, September 7, 1979, January 28, 1980 and March 27, 1980.

Testator died on August 3, 1978 at the age of 60. He was a widower at the time of his death and was survived by three children. By his will, prepared by an attorney and dated January 28, 1978, he left his entire estate to his daughter Barbara. The will was probated August 14, 1978 and this appeal followed.

On October 4, 1976, the decedent underwent surgery for a malignant brain tumor. The neurosurgeon, Dr. Gregory Lignelli, removed a large portion of the tumor but was unable to remove it all, as parts of the tumor extended throughout the brain. After surgery, the testator remained under the care of Dr. Lignelli and Dr. Scott Duffy until his death. He was treated with radiation and medication, and initially he did quite well. In early 1977, the testator enjoyed a vacation with

his sister in Florida. It was inevitable, however, that the tumor would spread, and by the fall of 1977 it was apparent that the testator was going downhill. The tumor's regrowth gradually weakened him both mentally and physically, making him totally dependent on others.

Decedent lived in his own home until March, 1978. After this he was either hospitalized or living with Barbara. It is undisputed that during decedent's last year, Barbara provided most of the care for her father, although the daughter, Rosemary, did provide some assistance. Barbara took care of the household chores as well as his financial affairs. Additionally, she took him to his doctor appointments and saw that his prescriptions were filled. The contestants freely admitted that the proponent provided invaluable companionship and services for their father. However, they urge that the will must be set aside because of decedent's alleged testamentary incapacity at the time of execution and alleged undue influence exerted by Barbara.

The test for determining the existence of testamentary capacity is whether a person has an intelligent knowledge regarding the natural objects of his bounty, the general composition of his estate, and what he desires done with it: *Hastings Est.*, 479 Pa. 122. One may suffer from physical and mental debility, have loss of memory, inability to recognize acquaintances, and yet still have a mind sufficiently sound to make a will. Additionally, one may be unable to handle his financial affairs, yet possess testamentary capacity: *Brantlinger Will*, 418 Pa. 236.

The burden of proof as to testamentary capacity initially rests with the proponent of the will. However, a presumption of capacity arises upon proof of execution by two subscribing witnesses: *Heiney Will*, 455 Pa. 574. Since there is no dispute that the will was properly executed, the burden shifts to the contestant to overcome that presumption by clear and compelling evidence: *Kuzma Est.*, 487 Pa. 91.

To support the alleged incompetence, contestants rely on the testimony of Dr. Lignelli. He testified that when he (Dr. Lignelli) saw the decedent six weeks prior to the execution of the will the decedent was not capable of a clear thought pat-

tern. While his opinion is relevant to the issue of decedent's mental capacity generally, it is too remote in time to be given much weight on the issue of testamentary capacity. Testamentary capacity is to be ascertained as of the date of execution of the contested document: *Ziel Est.*, 467 Pa. 531.

In our view, contestants' evidence as to decedent's incapacity is weak and insufficient to support their contention.

Of course, even if it is shown that the testator possessed the requisite testamentary capacity, he still may have been subjected to such undue influence as would invalidate the probated will: *Ziel Estate*, supra. The burden of proving undue influence rests upon the asserting party. To this end, the asserting party must establish that when the will was executed the testator was of weakened intellect, and that a person in a confidential relationship with the testator received a substantial benefit under the will: *Clark Est.*, 461 Pa. 52; *Fickert Est.*, 461 Pa. 653; *Shelly Est.*, 484 Pa. 322; *Reichel Est.*, 484 Pa. 610. Once each of these elements is shown by clear and convincing evidence, the burden shifts to the proponent of the will to refute the charge of undue influence: *Button Est.*, 459 Pa. 234; *Clark Estate*, supra; *Reichel Estate*, supra.

That Barbara Medaglia received the entire estate is undisputed. We then must turn to whether a confidential relationship existed between Barbara and the decedent and whether the decedent was of weakened intellect at the time the will was executed.

First, it is apparent from the facts on the record that Barbara enjoyed such a relationship with the decedent. A confidential relationship exists where the parties do not deal on equal terms, but on the one side there is an over-mastering influence, or on the other side, weakness, dependence or trust justifiably reposed, for in both situations an unfair advantage is possible: *King's Est.*, 369 Pa. 523. Here the evidence is undisputed that Barbara was very attentive to decedent's needs, performing such tasks as cooking his meals, doing his laundry, and running his errands, as well as handling his financial affairs. Barbara admits that the decedent depended upon her. We find, therefore, that Barbara enjoyed a confidential relationship with decedent.

We now turn to the issue of weakened intellect. Weakened intellect is not to be confused with testamentary capacity. The weakened mental condition as relevant to undue influence which must be shown need not amount to testamentary incapacity: *Clark Estate,* supra; *Ziel Estate,* supra. Further, it is undisputed that the condition of the testator at the time he executed the will is the real question where testamentary capacity is at issue; however, as sound as the rule is, it cannot be imposed on the law of undue influence: *Clark Estate,* supra.

The record shows that the decedent, in the months preceding the execution of the will, exhibited memory lapses concerning recent events, and failed to correctly distinguish family members at times. While these facts are inadequate to establish lack of testamentary capacity, they are certainly indicative of a weakened intellect.

The medical testimony is not really contradictory, Dr. Lignelli never really addressed the question of testamentary capacity. Dr. Duffy never directly addressed the question of weakened intellect.

The contestants rely on the testimony of Dr. Lignelli with regards to the mental condition of the testator. Dr. Lignelli's opinion was based both on his personal observation of the decedent, as well as his expertise as a neurosurgeon. He stated emphatically that decedent's brain tumor invaded his entire brain, debilitating both his mind and his body. He further testified that when he (Dr. Lignelli) saw the decedent six weeks prior to the execution of the will the decedent was not capable of a clear thought pattern, and that there was no way he could improve due to the extent of his malignant brain tumor. The disinterested opinion of Dr. Lignelli concerning the effect of the brain tumor on the mental condition of the decedent cannot be disregarded. We have carefully reviewed the record and find no convincing evidence to refute his testimony. In our view, under any realistic appraisal of the evidence, the contestants have shown by clear and convincing evidence that the decedent suffered from a weakened intellect as a result of his pervasive brain tumor.

Having found that when the will was executed (1) the testator was of weakened intellect; and, (2) that the sole

beneficiary of the will enjoyed a confidential relationship with the testator, the burden shifts to the proponent of the will to prove by clear and convincing evidence the absence of undue influence: *Clark Estate,* supra.

This may appear to some a harsh burden to meet. Indeed the late Mr. Justice Manderino argued vigorously in his dissent in *Reichel Estate,* supra, that the burden should not shift without some showing of causation by the contestants. However, the majority of the court found otherwise. The court has steadfastly and unequivocably stated that once a presumption of undue influence has been established by the contestants, the burden of proof or risk of nonpersuasion lies with the proponent; and, therefore, the difficult burden of proving a negative arises.

The proponent seeks to establish the absence of undue influence by showing that the will was prepared by an attorney. However, though it is clear that the attorney is a reputable member of the bar who had no prior dealings with the proponent, it is equally clear that he had no prior dealings with the decedent. In addition, the proponent was a witness to the will and was present during all events dealing with the preparation and execution of the will, apparently a first will of the decedent.

The proponent also relies on the fact that during the twenty minute attorney/client conference at decedent's home, the decedent stated that he wanted to leave everything to Barbara.[1] However, the decedent gave no reason for doing so and Barbara was at all times present in the room. No other persons were present.

Once the burden shifted, it was incumbent on the proponent to demonstrate the absence of undue influence by clear and convincing evidence. Other than the brief conference with the attorney, the proponent only offered, on the issue of undue influence, her own testimony. This falls far short of the

---

1. The record shows that the decedent was asked if he wanted to leave anything to his other children and he said "no." Attorney Miller testified Barbara asked the question. Barbara testified that Attorney Miller asked the question.

character and degree necessary to sustain her burden: *Button Estate,* supra. We find therefore, that the appellant's evidence failed to establish the lack of undue influence.