**HAHN HOME**

v.

**YORK COUNTY BOARD OF ASSESSMENT APPEALS**

v.

**York City School District**

v.

**York City.**

**Appeal of York City School District.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2000.

Decided May 17, 2001.

Jeffrey A. Gettie, York, for appellant.

Walter A. Tilley, York, for appellees.

Before SMITH, Judge, FLAHERTY, Judge (P.), and McCLOSKEY, Senior Judge.

FLAHERTY, Judge.

The York City School District (District) appeals from a decision of the Court of Common Pleas of York County (trial court) which reversed the York County Board of Assessment Appeals (Board) and determined that the Hahn Home, a private 501(C)(3) residential home for elderly women, was entitled to real estate tax

exemption status on the subject portion of the home.[1] We affirm.

The Hahn Home is a home for elderly unmarried women. It was founded in accordance with the will of the late Anna L. Garner in the 1920's. The specific language of the Articles of Incorporation provides a trust to be set up for:

[T]he erection, maintenance and support in or near the City of York, Pennsylvania, of a free home for worthy aged and unmarried women of good character and habits of the State of Pennsylvania, and not less than fifty years of age, who, by reason of misfortune in business or diminution in estate or means of support, for any reason, may not have sufficient means to support and maintain themselves in the way and with the surroundings of comfort and refinement which they customarily were wont to enjoy and which their habits of life and tastes require for a pleasant and comfortable existence.

Articles of Incorporation, November 22, 1928, at 2. After application and acceptance, each resident of the Hahn Home pays $1,000 as an admission fee for entry into the Home. In addition, each resident of the Hahn Home must turn over all of their current assets and agree to turn over all of their future assets to the Hahn Home. The Hahn Home provides its resident's shelter, housing and food, as well as transportation and medical expenses, including payment of their health insurance premiums and nursing home expenses if the ladies must be transferred from the Hahn Home to a nursing home.

The Hahn Home enjoyed unchallenged tax-exempt status from its inception in 1928 until 1993. In 1993, the District challenged the tax-exempt status of the Hahn Home for the property at 863 South George Street, York City, York County, Pennsylvania, with the Board. The Board ruled that the Hahn Home was not entitled to tax exempt status and that the Hahn Home property was taxable. The Hahn Home appealed to the trial court. The District and Intervenor, City of York, Pennsylvania (City), were the adverse parties in the assessment appeal.

At trial, all parties stipulated that a portion of the Hahn Home property was taxable and not entitled to tax exempt status. The trial court held a hearing on the remaining portion of the Hahn Home property. The President of the Hahn Home, Joseph W. Moyer (Moyer) testified that the Hahn Home was incorporated and founded in 1928 under a bequest from Anna (Hahn) Gardner, who left her entire estate for the purpose of founding and operating a home for single women to spend their waning years in comfort so that they would not become a burden, and could, in fact, possibly continue to contribute to the community. Notes of Testimony (N.T.), February 1, 2000, at 6–7. Under the terms of the covenant, articles of incorporation, and by-laws, ladies who come into the Hahn Home turn over their assets or estates to the Hahn Home and that money is added to the initial trust fund and invested to continue to provide funds to operate the Hahn Home. N.T. at 7–8.

The Hahn Home maintains a number of hourly employees who are paid $6.25 to $8.75 per hour. Three employees, the executive director, the assistant director, and the accountant, are paid salaries without bonuses on an annual basis. Employees are given raises based on cost-of-living, as set by the Board of Directors. N.T. at 11. No staff members in the Hahn Home are

---

1. The Hahn Home stipulated that a portion of the home was not tax-exempt. The remaining portion of the home is the subject of this appeal.

paid based upon the financial performance of the Hahn Home and none receive bonuses based on the financial aspects of the trust. N.T. at 11.

In return for the admission payment and conversion of assets, the Hahn Home provides the residents housing, meals tailored to the dietary needs of the individuals, cleaning and laundry services, 24–hour security, transportation to appointments or to maintain their involvement in the community, medical care, hospitalization, skilled medical care (both on and off premises), and, where required, nursing homes. N.T. at 14.

Also testifying on behalf of the Hahn Home was its accountant, Brenda Acworth Wise (Wise), a certified public accountant. Wise testified that there were no benefits, no earnings and no donations that benefited anyone outside the Hahn Home. N.T. at 36. The benefits were strictly for the maintenance of the residents at the Hahn Home. N.T. at 36. The monies earned on the investments or received from admission of the residents are used to provide the stated services for the residents of the Hahn Home. N.T. at 36. Wise further testified that all employees are paid based upon their position and not upon any financial performance of the Hahn Home. N.T. at 36.

Wise testified upon cross-examination that the total assets of the Hahn Home as of December 31, 1999, including investments, the two Gardner trusts and the property, were $8,146,098.88, of which a little over six million dollars were funded assets and a little over two million dollars was the value of the real and personal property. N.T. at 41. Wise testified that the only sources of income that the Hahn Home has is the interest and dividends earned on the investments plus any assets that would be contributed at the time of admission by a resident and separately the

interest from the trust. N.T. at 43. Wise testified that the funds (the trust funds and the guest assets fund) had grown substantially from 1993 to 1998. N.T. at 45.

Wise testified that the Hahn Home provides uncompensated (free) goods and services to the residents: which is equal to seventy-five percent of the net operating income of the Home; which is equal to ninety-five percent of the total operating expenses; where all but two residents have received goods and services that exceed any contributions they have made, and the two residents that have not exceeded their contributions, being the most recent admittees, are expected to exceed their contributions; where uncompensated services have exceeded five percent of the Hahn Home's costs of providing these services; and where the Hahn Home has received a 501(c)(3) tax-exemption for federal income tax purposes from the Internal Revenue Service and has held that status continuously from 1993 to the present. N.T. at 36–38.

■■■ The trial court determined that the Hahn Home's stated purpose "seems to allow a resident to have some assets. It merely requires that those assets not be sufficient to support and maintain the women in the way in which they customarily lived. There can be little dispute that...at the time of their admission that their assets were not sufficient to guarantee that they would continue to be able to enjoy that same scale of living...." Trial Court Opinion, May 2, 2000, at 3. The trial court concluded that the Hahn Home was exempt from taxation and that:

1. The real property of the Hahn Home is actually and regularly used for the purposes of the institution.

2. That the Hahn Home does meet the five-part test, and qualifies as a purely public charity, and

3. That the institution is required to operate entirely free from a private profit motive.

Trial Court Opinion at 7. The District appealed to our Court.[2]

On appeal, the District contends that the trial court erred in determining that the Hahn Home met its burden of proof under: Article VIII Section 2(a) of the Pennsylvania Constitution; Article II Section 204 of the General City Assessment Law and the five-part *HUP* test[3]; and Section 5(a) of the Institutions of Purely Public Charity Act (Act).[4]

The Pennsylvania Constitution authorizes the General Assembly to exempt Institutions of purely public charity from taxation under Article VIII, Section 2(a)(v), which provides in pertinent part as follows:

The General Assembly may by law exempt from taxation:

. . . .

(v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.

Pa. Const. Art. VIII, Section 2(a)(v). Section 204 of the General County Assessment Law (Law), Act of May 22, 1933, P.L. 853, as amended, 72 P.S. § 5020–204(a)(3) provides in pertinent part as follows:

(a) The following property shall be exempt from all County, City, Borough, Town, Township, Road, Poor, and School Tax, to wit:

(3) All . . . associations and institutions of . . . benevolence, or charity . . . with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, that the entire revenue derived by the same be applied to the support and to increase the efficiency of the facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose. . . .

72 P.S. 5020–204(a)(3). This Section includes an exemption for property owned by charities and used for charitable purposes. 72 P.S. § 5020–204(a)(3), 5020–204(a)(10). Article VIII, Section 2 of the Pennsylvania Constitution, however, limits this exemption to only those organizations which are institutions of purely public charity. *HUP*.

An organization does not qualify as a purely public charity merely because it is a non-profit corporation, and it is irrelevant whether the organization is recognized as a tax-exempt charity for federal income tax purposes. *Sacred Heart Healthcare System v. Commonwealth,* 673 A.2d 1021 (Pa.Cmwlth.1996). The test to determine what constitutes a purely public

2. Our review is limited to determining whether the trial court abused its discretion, committed an error of law or made findings unsupported by substantial evidence. *Mack Trucks, Inc. v. Lehigh County Board of Assessment Appeals,* 692 A.2d 661 (Pa.Cmwlth. 1997).

3. The five criteria of the *HUP* test are defined by the Pennsylvania Supreme Court in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985).

4. The Institutions of Purely Public Charity Act is the common name for the Act of November 26, 1997, P.L. No. 55, 10 P.S. § 371–385. Section 5(a) of the Act provides that:

An institution of purely public charity is an institution which meets the criteria set forth in subsections (b), (c), (d), (e) and (f). An institution which meets the criteria specified in this section shall be considered to be founded, endowed and maintained by public or private charity.

10 P.S. § 375(a). Subsections (b)(c)(d)(e) and (f) of this Section are outlined in the *HUP* test.

charity was decided by the Pennsylvania Supreme Court in *HUP*. By satisfying the *HUP* test, the applicant demonstrates that it meets the minimum constitutional qualifications for being an appropriate subject of a tax exemption. *Lehighton Area School District v. Carbon County Board of Assessment*, 708 A.2d 1297 (Pa.Cmwlth. 1998). In *HUP*, the Pennsylvania Supreme Court held that an entity qualifies as a purely public charity if it possesses the following characteristics:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from profit motive.

*HUP*, 507 Pa. at 22, 487 A.2d 1306.

## I.  *HUP* Test

The trial court considered each prong of the *HUP* test as it applies to the Hahn Home and concluded that the Hahn Home does meet each prong of the test.[5] The findings of a trial court in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury, and those findings will not be disturbed on appeal absent an error of law or clear abuse of discretion. *Estate of Shelly*, 484 Pa. 322, 399 A.2d 98 (1979).

## A.  *Advances a Charitable Purpose*

■ The District contends that under the Constitutional tax-exemption language and under prong (a) of the HUP test, the Hahn Home does not meet its own defined charitable purpose of providing a "free" home to worthy women because: the residents are required to pay an admission fee of $1,000 and to turn over their assets; and the Hahn Home failed to prove that all of the residents do not have sufficient means to support and maintain themselves.

The stated purpose of the Hahn Home, as that purpose is stated in its Articles of Incorporation, is charitable and, therefore, this argument is not a legal argument but a factual contention. The Hahn Home is meeting its stated purpose.

The trial court correctly concluded that the question then becomes whether the requirement that the resident turn over all her assets at the time of admission violates the requirements of the Hahn's Home's stated purpose to provide a quality of life for single women who have lost the ability to provide such for themselves. The charitable purpose does not require the women to be destitute, the charitable purpose requires that the elderly women's assets not be sufficient to support and maintain the women in the way in which they customarily lived. The trial court found:

There can be little dispute that even though each of the women contributed significant amounts at the time of their admission that their assets were not sufficient to guarantee that they would continue to be able to enjoy that same scale

---

**5.** The District does not dispute or brief for our review prong (e) of the *HUP* test, which is that the institution relieves the government of some of its burden, and therefore, we will not consider that issue. We have reviewed the record, which indicates that both parties litigated the matter and presented evidence in this regard at trial. The record clearly indi-

cates through various testimony that were it not for the Hahn Home, the residents who testified would clearly have to be supported by government subsidized housing of some nature in order to live. The trial court determined that the Hahn Home relieves the government of some of its burden and the issue will not be addressed here.

of living taking into account their loss of income from employment as they aged, and the increase in expenses occasioned by medical needs, hospitalization, and nursing home care that may become necessary. Therefore, it was the Court's finding that the requirement that the new resident surrender all assets was not in conflict with the stated purpose of the Hahn Home, and the Court further found that the Hahn Home did provide a free home after admission, the donation of assets having been completed as part of the process of becoming a resident.

Trial Court Opinion, May 2, 2000, at 3–4. The trial court's finding is supported in the record.[6]

Secondly, the District argues that because at least two of the residents have turned over assets in excess of $200,000, that the Hahn Home is accepting residents who do not meet the charitable purpose of the Hahn Home charter because these women have sufficient funds to pay all of their bills and expenses as of the date of their admission. After reviewing the record, we find substantial evidence to support the trial court's finding that while these women had assets, the assets were not sufficient to maintain their previous lifestyle for the rest of their respective lives. Based on the testimony and evidence presented at trial, the trial court concluded that prior to entering the Hahn Home, the residents of the Hahn Home had sufficient quality of life, so that even the greatest contribution of $200,000 in assets is still insufficient to pay all of their future living, medical and nursing home expenses and to continue to have quality of life.[7] The record supports this finding. Therefore, we find that the trial court was correct in finding that the Hahn Home advances a charitable purpose.

**B.  *Donates or Renders Gratuitously a Substantial Portion of its Services***

■ The District contends that the Hahn Home does not donate or render gratuitously a substantial portion of its services because each resident is charged an admission and turns over all of their current assets at the time they are admitted.

This Court established in *Lehighton,* that in order for the entity to satisfy its burden of establishing that it donates or renders gratuitously a substantial portion of its services, the entity must demonstrate that it makes a bona fide effort to service those persons who are unable to afford the usual fee or medical care. *Id.*

---

6.  The District also contends that because an employee of the Hahn Home resides in the home that this use is not supported by the purpose of the Hahn Home. The trial court found that "her use of the room is still for the purposes of the institution. By having a staff member on site, the Hahn Home is providing a better service to its residents, and thereby furthering the purposes of the institution." Trial Court Opinion at 4. This finding is supported by the record.

7.  During the cross-examination of Moyer, Appellant's attorney brought forth this testimony, on which the trial court relied:

> Q. And I see that in 1998, [E.B.] contributed $210,000, is that right?

A.  That's correct.
Q.  And [M.J.], $204,828?
A.  That's correct.
Q.  With that amount of money, wouldn't they be able to take care of themselves?
A.  They might for a short period of time, but as you can see when you look at the chart, the actual costs of maintaining someone in this economy are quite substantial, and I believe that both of those ladies would not have been able to have maintained themselves for the rest of their lives on their income.

N.T. at 17–18.

at 1303. *Lehighton* goes on to explain that a:

[C]haritable organization must show that it provides services to someone who cannot afford to pay, and the determination as to whether the services donated by the organization are "substantial" is to be made based on the totality of the circumstances; there is no bright line test, based on a certain percentage of donated services, for resolving this question. Furthermore, the organization need not forgo available government payments which cover part of its costs; nor is it required to provide wholly gratuitous services. [Citations Omitted].

*Id.* at 1303.

The trial court found that the amount of money spent on the residents far exceeds the amount it receives from its admission fees or the surrender of the residents' assets. The trial court noted in its opinion that the testimony overwhelmingly showed that the Hahn Home does donate or render gratuitously a substantial portion of its services.[8] The record supports this finding. Thus, the trial court was correct in finding that the Hahn Home donates or renders gratuitously a substantial portion of its services.

## C. Benefits a Substantial and Indefinite Class of Persons who are Legitimate Subjects of Charity

█ The Supreme Court has addressed this issue in *Unionville–Chadds Ford School District v. Chester County Board of Assessment Appeals*, 552 Pa. 212, 714 A.2d 397 (1998) and *In re City of Washington*, 550 Pa. 175, 704 A.2d 120 (1997). In *City of Washington*, the Supreme Court has

determined that the benefits of charity need not be limited to those who are in distress. "There is no requirement, however, that all of the benefits bestowed by a purely public charity go only to the financially needy." *City of Washington*, 550 Pa. at 185, 704 A.2d 120.

In *Chadds Ford*, the Supreme Court went further:

[A]dmission fees would have to be raised drastically if support from the charitable endowment were eliminated. Further, a facility as large and multi-faceted as Longwood is a unique resource that virtually no individual could afford to maintain on his or her own. It is in this regard comparable to a public library, museum, or art gallery. Such institutions have qualified as purely public charities notwithstanding the fact that many, indeed probably most, of their visitors are not incapacitated or poor. [Citations Omitted].

Thus, a purely public charity can provide members of the general public with resources that would not otherwise be within their financial reach. *See City of Washington*, 704 A.2d at 124 (persons who are financially secure may nevertheless be "poor" in relation to the outlays needed to obtain certain services in the absence of charity). *See also HUP*, 507 Pa. at 19 n. 9, 487 A.2d at 1315 n. 9 (purely public charities must serve those who would not otherwise be able to afford the full fees). Were it not for the high quality public park grounds and educational and research facilities that are subsidized by Longwood, many would not be able to afford the fees that would prevail for access to comparable

---

**8.** Wise testified extensively and in detail, along with the submission of numerous mathematical and accounting exhibits to explain that in most years, the Hahn Home operated at a deficit, and even recently, the Hahn Home provided in excess of 90% or 95% gratuitous goods and services to the residents. N.T. at 30–46.

resources, if, in fact, such resources could be found at all.

*Chadds Ford,* 552 Pa. at 219–220, 714 A.2d 397.

Therefore, the District's argument fails. The record reveals that the women of Hahn Home would be unable to afford the full amount of their care during their lifetime. The record supports the trial court's finding that the cost of the care of these women over the course of their life is significantly greater than any amount contributed by any of the residents. Thus, the trial court was correct in finding that the Hahn Home benefits a substantial and indefinite class of persons who are legitimate subjects of charity.

### D. Operates Entirely Free From Profit Motive

The District argues that the Hahn Home does not operate entirely free from profit motive because the Hahn Home has had investment revenue the past five years; and the Articles of Incorporation do not have specific language in them prohibiting the use of any surplus funds for the private inurement to any person in the event of a sale or dissolution of the institution.

Last year, the Supreme Court squarely addressed this exact issue in *Wilson School District v. Easton Hospital,* 561 Pa. 1, 747 A.2d 877 (2000). The Supreme Court reiterated that it was clear from *Saint Margaret Seneca Place v. Board of Property Assessment, Appeals and Review, County of Allegheny,* 536 Pa. 478, 640 A.2d 380 (1994), that surplus revenue is not synonymous with private profit. Instead, the Supreme Court developed a three-prong test to determine this fifth prong of the *HUP* test:

[A]rising from the dictates of *St. Margaret* and *Washington,* the focus of the court in determining whether the fifth prong of the *HUP* test is met should be:

1. Whether the utilization of the revenue is made with the expectation of a reasonable return or some non-monetary benefit;

2. Whether the utilization of the revenue ultimately supports or furthers the eleemosynary nature of the charitable entity;[9] and

3. Whether the utilization of the revenue inures, directly or indirectly, to any private individual related to the charitable entity or related organization(s).

*Wilson,* 561 Pa. at 8, 747 A.2d 877.

The Supreme Court determined in *Wilson* that where the tax-exempt organization, a hospital, reinvested the surplus monies in order to have the money available for the operation of the hospital, it met the first prong of this test. Where only 61% of the patients could not cover their expenses, the hospital was determined to render a significant donation to the community which far exceeded its net income and this satisfied the second prong of the test. Where the trustees of the hospital were not paid for their services and the administrators were paid a reasonable salary not based upon the performance of the hospital, this satisfied the third prong of the test. *Wilson* 561 Pa. at 8–9, 747 A.2d 877.

The Hahn Home satisfies all three prongs of this test for private profit motive because, like Eaton Hospital in *Wilson,* the record supports the conclusion that the Hahn Home reinvested its surplus and investment revenue solely for the benefit

---

**9.** Eleemosynary is defined in Webster's Collegiate Dictionary, tenth edition, as: "relating to or supported by charity."

of the operation of the Hahn Home and the ultimate benefit of the residents.

 Secondly, the District argues that the Hahn Home does not operate entirely free from profit motive because the Hahn Home's articles of incorporation do not contain the provision: "that expressly prohibits the use of any surplus funds for private inurement to any person in the event of a sale or dissolution of the institution of purely public charity," as specifically stated in the Act. 10 P.S. § 375(c)(4).

This Court has reconciled this situation in *In re RHA Pennsylvania Nursing Homes,* 747 A.2d 1257 (Pa.Cmwlth.2000) where we held:

> The Court cannot conclude that the General Assembly intended Section 5(c)(4) to require institutions of purely public charity to add the specific words of the Act to the institution's articles of incorporation. Rather, it is sufficient if the institution's articles of incorporation contain provisions that have the effect of the prohibition described in Section 5(c)(4).

*Id.* at 1261.

In the present controversy, the trial court correctly concluded that the Articles of Incorporation of the Hahn Home specifically incorporate the provisions of the Anna L. Garner Estate, which established the fund and require that the money may be used only for a charitable purpose and that any attempt to sell or dissolve the fund would be a violation of the Trust Fund. A review of the record supports this finding that the Hahn Home operated entirely free from profit motive.

As the Hahn Home has met all of the requirements under Article VIII Section 2(a) of the Pennsylvania Constitution, Article II Section 204 of the General City Assessment Law and the five-part *HUP*

test; and Section 5(a) of the Institutions of Purely Public Charity Act, we must affirm.

### ORDER

AND NOW, this 17th day of May, 2001, the order of the Court of Common Pleas of York County in the above-captioned matter is affirmed.