589 A.2d 679

**Ann C. MOSER, Administratrix of the Estate of John Moser, Jr., deceased, Appellant,**

**v.**

**Helen DeSETTA, Appellee.**

Supreme Court of Pennsylvania.

Argued March 7, 1991.

Decided April 18, 1991.

158

Thomas A. Bowlen, Uniontown, for appellant.

Ricardo J. Cicconi, Uniontown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is an appeal, by allowance, from a memorandum opinion and order of the Superior Court which affirmed an order of the Court of Common Pleas of Fayette County upholding the validity of a transfer in ownership of a certain bank account 392 Pa.Super. 660, 564 A.2d 267. At issue is whether the transfer of the bank account, by an elderly man and his wife, was attributable to undue influence, fraud, or lack of mental capacity. The factual background of this case is as follows.

The appellant, Ann C. Moser, is the administratrix for the estate of her late husband, John Moser, Jr. Mr. and Mrs. Moser were married in 1948. Mr. Moser worked as a coal miner until his retirement. The Mosers never had any children, and, as of 1985, had accumulated approximately $115,000 in lifetime savings. In March of 1985, when he was nearly seventy-eight years of age, Mr. Moser was diagnosed as being afflicted with cerebral arteriosclerosis. The physician who made this diagnosis observed that Mr.

Moser was suffering from confusion, memory loss, and other symptoms of senility. Mr. Moser did not know his own name, age, surroundings, or actions, and did not know the time, date, etc. The physician believed that Mr. Moser was unable to take care of his own affairs and advised him to move into a boarding home or nursing home. He continued to reside, however, in his own home with his wife.

According to Mrs. Moser, her husband did not recognize her at all during the spring, summer, and fall of 1985. She described him as repeatedly falling down and as becoming very violent towards her.

Early in August of 1985 one of Mr. Moser's sisters, Helen DeSetta, the appellee herein, came to Pennsylvania from Florida to visit her family. Shortly thereafter, Mr. Moser told DeSetta that he wanted to use his lifetime savings to start a new business. DeSetta claims that she discouraged him from pursuing this idea.

Between August 22 and 24, 1985, Mr. Moser, accompanied by DeSetta, visited an attorney to discuss divorce laws and powers of attorney. Mr. Moser then concluded that he did not have grounds to pursue a divorce. On August 30, 1985, Mr. Moser, again accompanied by DeSetta, went to the attorney's office and executed a general power of attorney giving DeSetta authority to manage his affairs. In the opinion of the attorney, Mr. Moser appeared lucid and did not have difficulty understanding what was said regarding the divorce laws and the power of attorney.

On September 4, 1985, DeSetta took Mr. Moser to the Gallatin Bank and assisted in placing the Mosers' funds into Treasury bills registered jointly in the names of Mr. and Mrs. Moser. Several days later, on September 9, 1985, Mr. Moser moved out of his home and into the residence of one of his other sisters, Ethel Moser. The move was accomplished with the assistance of DeSetta, who, during her visit in Pennsylvania, was staying at the Ethel Moser residence.

On September 16, 1985, DeSetta took Mr. Moser to meet Mrs. Moser at the Gallatin Bank. Mr. Moser, acting for

himself and not through the power of attorney, and his wife executed certain documents which transferred their funds, to wit, approximately $115,000, into a checking account bearing the names of Mr. Moser and Ethel Moser. Mrs. Moser, who, like her husband, was then in her late seventies in age, now claims that she did not understand that her interest in the funds was being transferred to Ethel Moser.

On October 10, 1985, DeSetta took Mr. Moser to a hospital emergency room because he was complaining of a stomach problem. The physician who examined him was the same one that diagnosed him as having cerebral arteriosclerosis in March of 1985. In the opinion of the physician, Mr. Moser was clearly still suffering from this condition in October of 1985. Mr. Moser was quite disoriented and was suffering from memory loss when he was examined at the hospital. For example, he did not remember his age or the nature of the problem that caused him to be brought to the emergency room. The physician believed that Mr. Moser continued to be incapable of managing his own affairs. He later formed an opinion that, in the months preceding that examination, Mr. Moser would not have been capable of overseeing his own money and property, or of reading and understanding legal documents such as the power of attorney executed on August 30, 1985.

On November 1, 1985, Mr. and Mrs. Moser entered into a consent order in the Court of Common Pleas of Fayette County. The consent order required Mr. Moser, through his attorney-in-fact DeSetta, to pay to his wife one-half of the balance in the checking account that had been established between himself and Ethel Moser. Hence, Mr. Moser was required to pay approximately $58,000, such being roughly one-half of the amount that had been transferred into the account in question through the transaction at the Gallatin Bank on September 16, 1985. The consent order also provided that Mr. and Mrs. Moser released each other from all duties of maintenance and support, but specified that Mrs. Moser would continue to receive health and retirement benefits under Mr. Moser's coal miner pension plan.

Further, Mrs. Moser agreed to withdraw a complaint which she had filed seeking support. The parties also agreed to negotiate a settlement of all of their remaining assets.

Around the same time, in late October or early November, 1985, Mr. Moser was moved from the residence of Ethel Moser to a nursing home. DeSetta claims that during the fall of 1985 Mr. Moser had at all times remained coherent and that his move to the nursing home was necessary, not because of his mental state, but rather to facilitate her return to Florida. Before being moved to the nursing home, Mr. Moser amended his life insurance policies to designate DeSetta as the beneficiary. On January 13, 1986, Mr. Moser died of pneumonia. Soon thereafter, the checking account that had been in his and Ethel Moser's names was changed to the ownership of DeSetta and Ethel Moser.

In 1986, Mrs. Moser instituted the present action in equity seeking, *inter alia*, to set aside the transfer of funds that occurred at the Gallatin Bank on September 16, 1985. The Court of Common Pleas denied relief. The Superior Court affirmed.

The scope of appellate review in a case such as this is quite limited. As stated in *Sack v. Feinman*, 489 Pa. 152, 165–66, 413 A.2d 1059, 1066 (1980), "[n]ormally, appellate review of equity matters is limited to a determination of whether the chancellor committed an error of law or abused his discretion." A final decree in equity will not be disturbed unless it is unsupported by the evidence or demonstrably capricious. *Id.* Further, "[t]he test is not whether we, the appellate court, would have reached the same result had we been acting as the hearing judge who saw and heard the witnesses, ' "but rather whether a judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor" '." *Masciantonio Will*, 392 Pa. 362, 367, 141 A.2d 362, 365 (1958) (citation omitted).

Mrs. Moser claims that DeSetta abused an alleged confidential relationship with Mr. Moser by receiving from

him a substantial benefit, i.e., an interest in the bank account, through undue influence. See generally *Estate of Shelly*, 484 Pa. 322, 332, 399 A.2d 98, 103 (1979). This claim is without merit. The record plainly demonstrates that DeSetta did not receive from Mr. Moser an interest in the bank account. Indeed, it was not until after Mr. Moser's death that DeSetta obtained any rights whatsoever in the bank account. Further, the record contains no evidence that DeSetta acted pursuant to an understanding that funds in the account would be transferred to her after Mr. Moser's death. The record simply does not contain any evidence of undue influence. To conclude that undue influence was present would be mere speculation. The trial court had ample basis, therefore, for not making a finding of undue influence.

■ It is also alleged by Mrs. Moser that she was fraudulently induced by DeSetta to participate in the transfer of funds at the Gallatin Bank on September 16, 1985. We have thoroughly reviewed the record, however, and find that the claim of fraud is unsubstantiated. Hence, the trial court properly determined that fraud was ·not established.

■ It is well established that fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture. *Frowen v. Blank*, 493 Pa. 137, 143, 425 A.2d 412, 415 (1981). We have held that "[f]raud is composed of a misrepresentation fraudulently uttered with the intent to induce the action undertaken in reliance upon it, to the damage of its victim." *Thomas v. Seaman*, 451 Pa. 347, 350, 304 A.2d 134, 137 (1973). The concealment of a material fact can amount to a culpable misrepresentation no less than does an intentional false statement. *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 484, 329 A.2d 812, 829 (1974). Nevertheless, a party alleging fraud has the burden of proving the same by clear and convincing evidence. *Estate of Bosico*, 488 Pa. 274, 278, 412 A.2d 505, 506 (1980).

The record contains no evidence whatsoever that DeSetta made any sort of misrepresentation to Mrs. Moser regarding the transaction at the Gallatin Bank. Even Mrs. Moser's own testimony does not give any indication of how she might have been deceived or misled. There is simply nothing to indicate that DeSetta or anyone else said or did anything to deceive Mrs. Moser.

The record indicates, at most, that Mrs. Moser may not have understood the full effect of the transaction at the Gallatin Bank. Not fully understanding the transaction is clearly not, however, the same as being defrauded. Mrs. Moser's testimony reveals that she was in her late seventies in age at the time of the transaction, and that she is at times rather confused. Her testimony is unclear as to whether she knew before signing the documents at the bank that funds would be transferred thereby to Ethel Moser. Nevertheless, nothing in her testimony indicates that DeSetta made any misrepresentations to her.[1]   Fur-

---

**1.** The following are excerpts from Mrs. Moser's testimony:

Q. Were you asked to go down to the Gallatin Bank and sign some documents or notes, papers?
A. I don't remember.
Q. I'm only asking for the best of your recollection?
A. I'm just not in good health.  I don't remember what happened any more....
Q. Let me ask you this, Mrs. Moser.  Did you ever intend to give any part of this one hundred and fifteen thousand dollars to Ethel Moser?
A. Well, she—whenever we were signing in the Gallatin Bank, I thought I was signing John's name so he would have the money, and then she opened her mouth and said Ethel was going to get fifty thousand.  Well, it was too late.  I didn't have nobody to help me or anything like that.
Q. You thought you were transferring money, but you didn't know it was going to Ethel?
A. Absolutely.
....
Q. It says, Gallatin Bank, and then it says—it is handwritten.  It says deposit Cashier's Check No. 074845 for this amount, $111,065.32 to Checking Account 0916246, John Moser, Jr., or Ethel Moser, and then underneath that, Ann C. Moser.  Do you recall—
A. I recall signing something there, and when she hollered and said that she had the power of attorney that John was going to give Ethel fifty thousand dollars.
Q. And so it was the time of signing this that you recall Helen DeSetta saying that?

A.  That's right.

Q.  Did you realize you were giving Ethel Moser fifty thousand dollars when you signed this?

A.  No, I thought I was signing my name so John would have it, God forbid anything would happen to me.

. . . .

Q.  It was your intention that day to sign away your interest in those accounts?

A.  Yes, for him because I figured this way, it was his money and he earned it and everything like that, but she had the power of attorney and—

. . . .

Q.  The money was already in both of your names.  You went there that day to do what?

A.  To I don't know what—what she was trying to do.

Q.  What did you understand you were doing?

A.  I didn't understand too much of it.

. . . .

Q.  Did you understand when you went to the bank and signed these documents that at that point in time your name was no longer on that money?

A.  It was.

Q.  You understood that?

A.  I understood that.  On his share my name wasn't on it.  It was his sister, Ethel, put on.  She put her name on it.

. . . .

Q.  What was supposed to happen after you did that?

A.  Well, I thought maybe everything would be all right.

. . . .

Q.  Your understanding when you signed these documents was you were supposed to get half and he was supposed to get half?

A.  Why sure, because we really saved every penny.

Q.  Let me ask you this then.  What was supposed to happen with his half?

A.  He gave it to his sister, Ethel.

Q.  You understood that day he was going to give it to his sister, Ethel?

A.  I didn't know until she said.

Q.  Until who said?

A.  His sister said.

Q.  Which sister?

A.  Helen.

Q.  She said what?

A.  That Ethel was going to get fifty thousand.

Q.  You understood at that point in time Ethel was going to get fifty thousand?

A.  At that time, I figured that was the way they wanted it.

Q.  It was okay with you?

A.  It was okay with me.

Q.  And you signed.

A.  I signed that.

. . . .

ther, testimony that the transaction was fully explained to Mrs. Moser was provided by DeSetta.[2]

It would indeed be unfortunate if Mrs. Moser signed away her interest without fully comprehending the consequences of her actions. The record, however, demonstrates nothing more than a possibility that she lacked a full understanding of the transaction and falls far short of what would be required as proof of fraud. We find no basis, therefore, to overturn the chancellor's determination that fraud was not established.

Finally, Mrs. Moser alleges that her husband lacked the mental capacity to make a gift of his savings to Ethel Moser on September 16, 1985. See generally *Sobel v. Sobel*, 435 Pa. 80, 82–83, 254 A.2d 649, 651 (1969) (mental

---

Q. Just answer my question. Was your understanding that you were going to have half the money, John was going to have half the money, and John was going to give half of his money to Ethel? Is that what you understood?
A. Yes. That is what I understood.
. . . .
Q. But you did understand that John's intentions were to give half of the money to Ethel?
A. Yeah, but not that much.
Q. How much?
A. It was too late.
Q. What did—how much then? How much did you understand?
A. I don't know.
. . . .
Q. When you signed those papers, were there people from the bank there?
A. Yes, two women were there.
Q. Did they explain to you what those papers meant?
A. I think they said I have to sign my name on them.
Q. You don't recollect if they explained to you what the import and the intent of those papers were?
A. No.
Q. You don't remember?
A. I don't remember.

**2.** DeSetta testified as follows:
Q. Ann was there?
A. . . . She came, and she willingly signed. The people at the bank explained to her that she is signing over her share. She said, if that is the way he wants it, that is the way he can have it, and I even said to her, Ann, you don't have to do it. She said, I'm going to do it, and she signed.

competency to make a gift). She further alleges that the trial court erred in not making any finding as to whether her husband was competent on that date.

The trial court focused solely on the power of attorney executed by Mr. Moser on August 30, 1985, and held that Mr. Moser was then competent. In reaching that determination the testimony of the attorney who prepared the power of attorney, who said that Mr. Moser appeared lucid, was viewed by the trial court as more persuasive than the testimony of the physician who testified that Mr. Moser was mentally incapable of managing his affairs. It was reasoned that more weight should be given to evidence regarding Mr. Moser's condition on the day he executed the document than to the testimony of a physician who examined him five months before and six weeks after the power of attorney was executed. Compare *Masciantonio Will*, 392 Pa. at 381–88, 141 A.2d at 372–75 (opinions of physicians who were not present at the execution of a document, but who observed the scrivener quite near the time of execution, should be regarded as being of the same quality as testimony of witnesses who were present when the document was executed).

Although a determination of whether the power of attorney was valid may have been necessary to resolve other claims raised by Mrs. Moser, it was plainly not determinative as to whether Mr. Moser was competent seventeen days after the power of attorney was executed, i.e., when the transaction at the Gallatin Bank occurred on September 16, 1985. Both parties concede that the power of attorney was not used in the transaction, and that Mr. Moser acted in his own behalf on that date. A remand to the Court of Common Pleas is necessary, therefore, so that the crucial factual issue of competency on the date in question can be resolved.

We are in agreement, therefore, with the determination of the courts below that Mrs. Moser is not entitled to invalidate the bank account transfer on the basis of alleged undue influence and fraud. The issue of Mr. Moser's

competency on September 16, 1985 must, however, be resolved by the trial court.

Order of the Superior Court affirmed in part, and case remanded to the Court of Common Pleas.

PAPADAKOS, J., concurs in the result.

LARSEN, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

The issue raised by this appeal is whether the decedent, John Moser, Jr., made a valid gift in September of 1985, when he transferred his and his wife's life savings into a joint savings account bearing his name and the name of one of his sisters. Because I believe that the evidence showed that the decedent was subject to undue influence by a person who was in a confidential relationship with him at the time he made the transfer, I find that there was no valid gift, and therefore, I vigorously dissent.

As a general rule in this Commonwealth, the burden of proving that a transfer of property was not a gift rests on the party so asserting. *Dzierski Estate*, 449 Pa. 285, 296 A.2d 716 (1972). This general principle does not apply, however, "where the relation of the parties to each other, or some vicious element in connection with the transaction, is such that the law compels the recipient of the bequest or gift to show that it was the free, voluntary and intelligent act of the person giving it." *Id.*, 449 Pa. at 289, 296 A.2d at 718. The existence of a confidential relationship shifts the burden of proof, and can be shown where the "circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *Id.*

In this case, the decedent was seen in the emergency room of Brownsville Hospital by his family physician in March of 1985. At that time, the decedent, nearly seventy-eight years old, was found to be confused and disoriented, i.e., he did not know who he was, his age, the time, the date,

and what he was doing. He was in a weakened physical condition and could not control his bowels. He was diagnosed as suffering from transient ischemic cerebral attack and cerebral arteriosclerosis resulting in chronic brain syndrome (senility), conditions which are *not* reversible. When he was discharged after five days in the hospital, he was better able to walk, but there was no improvement in his mental abilities.

Approximately five months later, the decedent's sister, appellee, Helen DeSetta, returned to Pennsylvania, from her home in Florida, and immediately assumed control of the decedent's life and financial affairs. Appellee took decedent to the office of her attorney to sign a power of attorney that appointed appellee as decedent's attorney-in-fact. Appellee directed the decedent to purchase treasury bills with the substantial sums of cash that he and his wife, appellant herein, had saved during the years of their marriage. Appellee removed decedent from the home that he had shared with the appellant for thirty-seven years, and moved him into the family home in which appellee was then staying with another sister. Appellee arranged for the treasury bills to be transferred into a joint savings account bearing the names of the decedent and this other sister *for whom appellee also served as attorney-in-fact.*[1] Appellee moved the decedent into a nursing home when he became too sick to be cared for in her home.[2] And appellee took control of the decedent's pension benefits and insurance policies, arranging for decedent to change the named bene-

1. The fact that appellee was the attorney-in-fact for the sister who became the joint owner of the decedent's savings account is evidence that appellee *did* receive a benefit from this transfer. Thus Mr. Justice Flaherty, writing for the majority, is mistaken in stating that "DeSetta did not receive from Mr. Moser an interest in the bank account." Maj. op. at 163.

2. Mr. Justice Flaherty, writing for the majority, states that the move to the nursing home was "necessary, not because of [decedent's] mental state, but rather to facilitate [appellee's] return to Florida." Maj. op. at 681. This is simply not true. According to appellee's own testimony, she placed him in a personal care home after he became ill, and she knew she would not be able to take him to Florida with her as she had planned. Reproduced Record at 118a.

ficiary on those policies from his wife to appellee. Immediately after the decedent passed away, appellee substituted her name for his on the joint savings account.

In sum, appellee, within a one month period, was able to sunder a thirty-seven year marital relationship and to assume and exercise absolute and total control over an ailing, senile man's personal and financial interests, which interests included appellant's share of marital assets. In light of this overwhelming evidence of a confidential relationship, the burden shifted to appellee to prove that the gift was the "free, voluntary and intelligent act" of the decedent, by clear, direct, precise and convincing evidence. *Donsavage Estate*, 420 Pa. 587, 218 A.2d 112 (1966). The appellee did not present *any* evidence as to the decedent's competency to make a gift on the day that the transfer of the decedent's assets into the joint savings account occurred in September of 1985. Thus, appellee did not prove that the decedent was not subject to undue influence at the time he made the gift and did not sustain her burden of proving that the gift was valid.[3] The majority is giving the appellee a second bite of the apple in remanding the case and giving her the opportunity to prove what she failed to prove when she had the burden of doing so.

Accordingly, I dissent and would reverse the order of the Superior Court which affirmed the order of the Court of Common Pleas of Fayette County.

---

**3.** Moreover, I find that the facts of this case clearly establish the concealment of material facts from the appellant, amounting to fraud. The testimony set forth in the majority opinion indicates clearly and convincingly that appellant did not know until *after* she had transferred her interest in the couple's life savings that the decedent's sister, whose attorney-in-fact was appellee, would be getting a share of those assets. Maj. op. at 164–166 n. 1. Appellee did not contradict this evidence when she testified during the hearing in this matter. In light of appellant's age, confusion, and lack of financial savvy, it was incumbent upon the appellee to explain the transaction and its consequences in a full and complete manner, ensuring that all of the circumstances were understood by the appellant before the appellant signed her name to the relevant documents. This was not done. Hence, I disagree with the majority's finding that there was no fraud herein.