**In re Estate of Hydock**

C.P. of Philadelphia County, O.C. no. 42 DE of 1992.

*Stephen C. Josel* and *William M. Labkoff,* for petitioner. *Stephen Schatz,* for respondent.

HERRON, *J.,* February 22, 2006—

## INTRODUCTION

This opinion addresses the factual question of whether a disclaimer of interest executed by the sole heir should be set aside for alleged fraud committed by the adminis-

tratrix and/or whether the disclaimer should be set aside on legal grounds for failure to issue the notice of beneficial interest required by Pennsylvania Orphans' Court Rule 5.6. The parties were given an opportunity to present testimony and evidence on these issues at a hearing. For reasons which follow hereinafter, this court grants the petitioner's request to set aside the disclaimer on the grounds of fraud and the related failure to issue the required notice of beneficial interest. In addition, further equitable relief is mandated to address the substantial concerns that further wrongdoing may occur.

## HISTORY OF THE CASE

On June 14, 2002, Joseph Edward Hydock III (decedent) died in a motor vehicle accident. At the time, he was a resident of Philadelphia County and had no will. He was survived, among others not relevant to this controversy, by his father, Joseph Edward Hydock Jr. (petitioner), his sister, Danielle Stauffer, as well as by Shirley Culp, a stepsister and Irving Culp, a stepbrother.[1]

Approximately one week following decedent's death, a meeting was arranged by the law offices of Oscar Schermer, Esquire. Danielle Stauffer, Shirley and Irving Culp, Cecelia Baum, Mr. Schermer and his assistant all attended the meeting. Petitioner was not invited. As a

---

1. Joseph Edward Hydock Jr.'s petition to set aside disclaimer, ¶¶1-4; respondent Danielle Stauffer's answer, ¶¶1-4. Shirley and Irving Culp are not related to petitioner. Petitioner and Edith Culp were the parents of decedent and respondent Danielle. Edith Culp (a/k/a Baum), who died in 1985, was also the mother of Shirley and Irving Culp. 3/15/2005 Hearing Transcript (N.T.) at 44-45 (Mary Hydock); 3/15/2005 N.T. at 160-61 (Hydock).

result of the meeting, it was agreed that petitioner was not capable of serving as administrator of decedent's estate and Danielle Stauffer was capable of doing so.[2] Cecelia Baum, a long-time neighbor and friend of petitioner, was provided with a form renunciation document and thereafter approached petitioner to request that he sign and renounce his interest in administering the estate in favor of his daughter, Danielle Stauffer.[3]

Mr. Hydock lives with his mother Mary Hydock, who is the grandmother of Danielle and the decedent.[4] When Cecelia Baum brought the renunciation form to Hydock, both she and his mother read it to him because, she testified, he could not read and she had been in the habit of reading documents to him in the past. After Hydock signed the renunciation, they took him to a notary before whom he signed the renunciation. Afterwards, they returned the renunciation to Oscar Schermer.[5]

According to petitioner, he signed the renunciation because he trusted his daughter, Danielle, to administer his son's estate.[6] When he signed the renunciation, however, he did not know the value of his son's estate nor the identity of its beneficiaries.[7] The attorney who prepared the papers for the estate had no recollection of send-

2. 3/15/2005 N.T. at 14-16, 21 (Cecelia Baum); 3/15/2005 N.T. at 205 (Schermer).

3. 3/15/2005 N.T. at 16 (Cecelia Baum).

4. 3/15/2005 N.T. at 159-60 (Hydock).

5. 3/15/2005 N.T. at 16-17 (Cecelia Baum).

6. 3/15/2005 N.T. at 164 (Hydock).

7. 3/15/2005 N.T. at 164-65 (Petitioner referencing exhibit P-2).

ing petitioner the notice of beneficial interest required by Pennsylvania Orphans' Court Rule 5.6.[8]

On July 10, 2002, Danielle Stauffer filed a petition for the grant of letters of administration.[9] That petition listed petitioner and Edith Ann Baum as the sole heirs of the Joseph Edward Hydock III estate,[10] but since Edith Baum (a/k/a Culp) had died in 1985,[11] petitioner was the sole heir to the estate of his son.[12]

Petitioner, 54 years of age, has been examined by various psychological and psychiatric professionals and tested over the years with consistent findings classifying him as of borderline intelligence with an IQ of approximately 72, placing him at the three percent level among all those tested. He is classified at the first grade level in both reading and reading comprehension skills.[13]

---

8. 3/15/2005 N.T. at 207 (Schermer) (conceding that he prepared the papers for the estate of Joseph Hydock III but having no recollection of sending the 5.6 notice to petitioner). Rule 5.6 requires that this notice be sent within 3 months of the grant of letters.

9. 3/15/2005 N.T. at 209 (Schermer).

10. See exhibit P-11.

11. Edith Baum, the mother of decedent and Danielle Stauffer, died in 1985. See P-14, 3/10/2004 deposition of Danielle Stauffer at 7. The redacted deposition of Ms. Stauffer was admitted to evidence as P-14. 3/16/2005 N.T. at 16-17.

12. 3/15/2005 N.T. at 209 (Schermer).

13. The petitioner presented the testimony and reports of a psychologist, Dr. Bonnie Socket, and a psychiatrist, Dr. Richard Saul. The respondent presented testimony by a psychiatrist, Dr. Timothy Michals. They all agreed on these key points relating to petitioner's IQ and reading ability. See *e.g.,* 3/15/2005 N.T. at 75-79 (Socket); exhibit P-4; 3/15/2005 N.T. at 131-32 (Saul); 3/16/2005 N.T. at 84, 92-93 (Michals).

He relies upon trusted individuals to read and explain documents to him.[14]

In or about September 2002, petitioner telephoned Mr. Schermer. While the parties dispute the nature of the call and the substance of the conversation, there is no dispute that Mr. Schermer hung up on petitioner following a brief conversation.[15] Petitioner claims he called to ask for his money from the estate.[16] Mr. Schermer and his legal assistant who listened in to the telephone call on speaker phone both claim that petitioner indicated that he wanted his daughter to administer the estate (although she had been doing so since the renunciation was executed several months before), that he did not want any money from the estate, that he wanted his daughter to receive the money and that he had been a poor father.[17] Given all the circumstances and the demeanor of the witnesses presenting testimony, this court is convinced that petitioner's testimony is credible and that the testimony of Mr. Schermer and his assistant is not.

Thereafter, Danielle Stauffer appeared in Mr. Schermer's office on December 5, 2002 and signed an inventory indicating a gross estate valued at $533,993.78, which represented the proceeds from the wrongful death action. During this meeting, a two-page disclaimer was prepared for petitioner to sign renouncing his beneficial

---

14. 3/15/2005 N.T. at 17 (Cecelia Baum); 3/15/2005 N.T. at 31 (Mary Hydock).

15. 3/15/2005 N.T. at 167-68 (Hydock); 3/15/2005 N.T. at 215-16 (Schermer).

16. 3/15/2005 N.T. at 167-68 (Hydock).

17. 3/15/2005 N.T. at 215 (Schermer); 3/16/2005 N.T. at 20-23 (Nuss).

interest in the estate not only in favor of his daughter, Danielle Stauffer, but also in favor of two others who were misidentified as his children: Shirley Culp and Irving Culp.[18] In contrast to the renunciation, Cecelia Baum was not asked to present the disclaimer to Hydock.[19]

On December 7, 2002, Danielle Stauffer, accompanied by Virginia Nace and Barbara Foster, who are both sisters-in-law, drove to petitioner's apartment. Ms. Stauffer exited the vehicle and went inside petitioner's apartment where both petitioner and his mother resided.[20] She did not present the disclaimer to petitioner for review[21] but had him accompany her to the car and then proceeded to drive to a notary public. Because petitioner had no identification with him, they drove back to petitioner's apartment, retrieved identification and then returned to the notary public where the disclaimer was signed by petitioner and witnessed by the others.[22] At no time was the disclaimer read or its full legal implications[23] explained to petitioner and at no time was peti-

---

18. See exhibit P-10 (inventory); 3/15/ 2005 N.T. at 211-12 (Schermer); exhibit P-9 (disclaimer).

19. 3/15/2005 N.T. at 18 (Cecelia Baum).

20. 3/16/2005 N.T. at 52-55 (Danielle Stauffer); 3/16/2005 N.T. at 5-10 (Barbara Foster); 3/15/2005 N.T. at 101-105 (Virginia Nace).

21. 3/15/2005 N.T. at 170, 172, 173 (Hydock) (Petitioner testified that he did not get a chance to see the disclaimer before signing it nor was he given a copy of it to show his mother). P-14, 3/10/2004 depo. of Danielle Stauffer at 37 (Danielle left disclaimer in car when she picked up her father from her grandmother's apartment).

22. 3/15/2005 N.T. at 169-75 (Hydock); 3/15/2005 N.T. at 103-11 (Nace); 3/16/2005 N.T. at 5-11 (Foster).

23. Danielle admits that she did not read the disclaimer to her father; instead, she told him "you have to sign the paper in order for me to receive the money." She admits that she did not tell him that, based

tioner given a copy of the disclaimer.[24] Instead, Danielle Stauffer told the petitioner that it was necessary to sign the disclaimer so that the state would not receive the estate proceeds.[25] Finally, on February 11, 2003 a notice of beneficial interest in the estate of Joseph E. Hydock III was sent to Danielle Stauffer, Shirley Culp and Irvin Culp.[26]

## DISCUSSION

*1. The Disclaimer Should Be Set Aside Where Petitioner Presented Clear and Convincing Evidence That the Fiduciary of His Son's Estate Procured Petitioner's Disclaimer by Fraud and the Disclaimer Itself Was Inherently Fraudulent in Its Designation of Certain Beneficiaries As Petitioner's Children*

It is uncontested that Danielle Stauffer took the initiative to have herself named administratrix of her deceased

---

on this disclaimer, Shirley and Irvin Culp would get money from the estate. Exhibit P-14 (Stauffer depo.) at 38-39. Although she realized that this disclaimer would prevent her father from getting anything, she nonetheless "told him I would give him money once I received it" without disclosing the estate's value of $533,000. Exhibit P-14 at 40-41.

24. Mary Hydock testified that her granddaughter did not bring the disclaimer up to the apartment when she came in December to pick up her father. 3/15/2005 N.T. at 41. Virginia Nace, respondent's sister-in-law, testified that Danielle kept the disclaimer after petitioner signed it. 3/15/2005 N.T. at 111.

25. 3/15/2005 N.T. at 185-86 (Hydock); 3/16/2005 N.T. at 78 (Michals); 3/15/2005 N.T. at 39, 41 (Mary Hydock).

26. See exhibit P-12. In explaining this delay, the attorney for the estate noted that he had been sick in the hospital for a while. He had, however, been able to prepare the disclaimer and inventory in December 2002. 3/15/2005 N.T. at 228-31 (Schermer).

brother's estate by asking her father to renounce that role. He yielded to her request because he trusted her. Under long-standing Pennsylvania precedent, that trust is protected by the fiduciary duty imposed on an executor or administratrix of an estate. As the Superior Court recently observed:

"More than one-half century ago, our Supreme Court defined the role and duty of an executor as a fiduciary. 'An executor is a fiduciary no less than is a trustee, and, as such, primarily owes a duty of loyalty to a beneficiary of his trust. Executors, as well as other fiduciaries, are under an obligation to make full disclosure to beneficiaries respecting their rights and to deal with them with utmost fairness.'" *Estate of Harrison,* 745 A.2d 676, 679 (Pa. Super. 2000). (citations omitted)

In addition to this obligation of full disclosure, a fiduciary is also bound by a rule forbidding self-dealing both, "to shield the estate and its beneficiaries and ensure[s] the propriety of the executor's conduct." *Estate of Harrison,* 745 A.2d at 679. As the Pennsylvania Supreme Court observed, the "test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in a material connection." *Noonan Estate,* 361 Pa. 26, 31, 63 A.2d 80, 83 (1949). (emphasis in original)

The fiduciary in this case, Danielle Stauffer, clearly had a personal interest in obtaining her father's disclaimer of interest in his son's estate. By procuring a disclaimer from her father without disclosing the size of the estate

or that he was its sole beneficiary,[27] Danielle Stauffer became a beneficiary of her brother's estate. She therefore had a clear personal interest in the procurement of her father's disclaimer such that it might have affected her judgment.

Based on the record presented, this court further concludes that Danielle Stauffer obtained her father's disclaimer by fraudulently representing to petitioner that it was necessary to sign the disclaimer so that the state would not receive the estate proceeds,[28] and on that basis, petitioner signed the disclaimer without reading or understanding the true nature of the document.

It is well established that "fraud consists of anything calculated to deceive, whether by a single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Moser v. DeSetta*, 527 Pa. 157, 163, 589 A.2d 679, 682 (1991). (citations omitted) Moreover, the Pennsylvania Supreme court observed in *Moser*, the "concealment of a material fact can amount to a culpable misrepresentation no less than does an intentional false statement." *Id.* The elements of fraud consist of:

---

27. Exhibit P-14, 3/10/2004 Stauffer depo. at 34; 3/16/2005 N.T. at 65 (Stauffer); 3/15/2005 N.T. at 164-65 (Hydock).

28. 3/15/2005 N.T. at 185-86 (Hydock). Respondent's own witness, Dr. Michals, testified that petitioner told him that "his daughter told him to sign a statement concerning another legal document or otherwise the state may get the money." 3/16/2005 N.T. at 78 (Michals). Mary Hydock stated that Danielle told petitioner he needed to sign the paper "in order to get the money," 3/15/2005 N.T. at 39, and because otherwise the state was going to take the money. 3/15/2005 N.T. at 41 (Mary Hydock).

"(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result." *Pittsburgh Live Inc. v. Servov,* 419 Pa. Super. 423, 428-29, 615 A.2d 438, 441 (1992). (citations omitted) Moreover, fraud or intent to defraud "is never presumed and must be proved by evidence that is clear, precise and convincing." *Snell v. Commonwealth, State Examining Board,* 490 Pa. 277, 281, 416 A.2d 468, 470 (1980). (citations omitted)

In cases involving a confidential relationship, however, the Pennsylvania Supreme Court has emphasized that the "well settled doctrine, founded on strong considerations of public policy, renders inapplicable the general rule requiring an affirmative showing of fraud. To the contrary, transactions between persons occupying a confidential relationship are prima facie voidable, and the party seeking to benefit from such a transaction must demonstrate that it was 'fair, conscientious and beyond the reach of suspicion.' " *Young v. Kaye,* 443 Pa. 335, 342, 279 A.2d 759, 763 (1971). (citations omitted)

It is clear to this court that Danielle Stauffer aided and abetted by the preparation of a two-page disclaimer intended to deceive petitioner into renouncing his interest in his deceased son's estate. The plan, although it succeeded, was ineptly and poorly executed. First, it is clear that the disclaimer subsequently executed by petitioner characterized Shirley Culp and Irving Culp as petitioner's

children,[29] which was factually incorrect.[30] Second, by all accounts, petitioner was never given a copy of the document and it was never read to him in the presence of anyone[31] at any time even though it was well known that he could neither read nor comprehend documents but relied on others to explain them.[32] Third, Shirley Culp had evicted petitioner from her mother's home in 1994 and it was known that petitioner and Shirley Culp disliked each other and thus renouncing his interest in the estate and allowing one-third of the estate to pass to Shirley Culp was inconceivable as a volitional act by petitioner.[33] Fourth, in the automobile on the way to the notary, Danielle Stauffer never told petitioner the amount of the estate, although she was aware of this in November 2002, never told her father that he was the sole heir and never corrected petitioner when he erroneously mentioned the claim of Cecelia Baum against the decedent's estate when, in fact, it was the claim of Melissa Baum on behalf of her son who died in the automobile with decedent.[34] Fifth, and perhaps most telling, Danielle Stauffer told her father that she would give him money but never

---

29. See *e.g.,* exhibit P-9 (disclaimer).

30. Exhibit P-14, 3/10/2004 Stauffer depo. at 35.

31. See *e.g.,* exhibit P-14, 3/10/2004 Stauffer depo. at 37-38, 42, 52-53; 3/16/2005 N.T. at 57(when asked if she ever showed petitioner the disclaimer document, Stauffer responded "No, I didn't"); 3/15/2005 N.T. at 170, 172-75 (Hydock) (stating that Danielle never showed him the disclaimer).

32. 3/15/2005 N.T. at 17 (Cecelia Baum).

33. 3/16/2005 N.T. at 35 (Shirley Culp); 3/16/2005 N.T. at 65-66 (Stauffer). Danielle conceded that she never told her father the estate would be divided to provide for Shirley and Irving Culp. 3/16/2005 N.T. at 71.

34. 3/16/2005 N.T. at 66-67, 69-70 (Stauffer).

indicated that the disclaimer removed him entirely and provided for division of the estate to her, Shirley and Irving Culp, and she admitted remaining silent on these most salient points.[35]

Finally, Ms. Stauffer failed to adhere to Pennsylvania Orphans' Court Rule 5.6(a) which provides that "[w]ithin three months after the grant of letters, the personal representative to whom original letters have been granted or the personal representative's counsel shall send a written notice of the estate administration in the form set forth in Rule 5.7" in the case of intestacy to all intestate heirs. Since letters of administration were granted to Danielle on July 10, 2002, and her petition for these letters listed her father as the sole intestate heir of the estate, she had until approximately October 10, 2002 to send this formal notice to him. Her attorney, however, had no recollection of preparing this notice, and while he explained this omission as due to his illness and hospitalization, he nonetheless was able to prepare the estate inventory and disclaimer by December 2002.[36] No explanation was offered as to why a Rule 5.6 notice had not been prepared as well. Ms. Stauffer's failure to provide this required notice to her father is all the more striking in light of the notice of beneficial interest that was subsequently sent to her, Shirley Culp and Irving Culp with a file date of February 13, 2003.[37]

---

35. 3/16/2005 N.T. at 54-55, 70-71 (Stauffer); exhibit P-14, 3/10/2004 Stauffer depo. at 35, 39, 40-41.

36. 3/15/2005 N.T. at 207 (no recollection re 5.6(a) notice to petitioner), 211-12 (prepared 12/05/2002 inventory and disclaimer), 229-30 (Schermer).

37. See exhibit P-13.

On these facts, the court unhesitatingly finds that fraud has been proven by the standard of clear and convincing evidence, that Ms. Stauffer breached her fiduciary duty to her father, and that petitioner's disclaimer should be set aside.[38] The respondent argues against setting aside the disclaimer by invoking 20 Pa.C.S. §6205(a),[39] which provides:

"In General—A disclaimer relates back for all purposes to the date of the death of the decedent or the effective date of the inter vivos transfer or third party beneficiary contract as the case may be. The disclaimer shall not in any way diminish the interest of any person other than the disclaimant in such person's own right under the instrument creating the disclaimed interest or under the intestate laws nor diminish any interest to which such person becomes entitled under subsection (b) by the disclaimer." 20 Pa.C.S. §6205(a).

In addition, she invokes *Estate of Ciaffoni,* 787 A.2d 971 (Pa. Super. 2001), in which the Superior Court ana-

---

38. Because Ms. Stauffer was a fiduciary with a conflict of interest and potential self-dealing, it is well established that "where there is self-dealing [by] a fiduciary, it is immaterial to the question of his liability in the premises whether he acted without fraudulent intent . . . ." *Banes Estate,* 452 Pa. 388, 395, 305 A.2d 723, 727 (1973). (citation omitted) As the Superior Court recently explained, the "test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in a material connection. . . . The fiduciary's disqualifying interest need not be such as 'did affect his judgment' but merely such as 'might affect his judgment.' " *Estate of Harrison,* 745 A.2d 676, 679 (Pa. Super. 2000). (citations omitted) (emphasis added)

39. See respondent's answer, memorandum at 1-2; respondent's pretrial memorandum at 2.

lyzed the "plain meaning" of the statutory language in section 6205 to conclude that "the disclaimant is precluded unequivocally from revoking a *properly executed disclaimer.*" *Id.,* 787 A.2d at 974. (emphasis added) The operative words in this opinion, however, are that a disclaimer is "properly executed." Moreover, the facts of *Ciaffoni,* which the court characterized as a case of first impression, are highly distinguishable. In *Ciaffoni,* the party seeking to revoke his disclaimer had been involved in a heated will contest and had consciously disclaimed his interest to express his belief that the will was invalid. When he thereafter sought 17 years later to revoke that disclaimer on the grounds that there would be no prejudice to any beneficiaries since no distributions had occurred, the Superior Court rejected "lack of prejudice" as a rationale for revoking the disclaimer. In contrast to the instant case, however, there was no allegation in *Ciaffoni* that the disclaimer had been improperly executed as the result of fraud by a fiduciary/beneficiary or that the disclaimer itself was fraudulent.

The other case invoked by respondent, *Pedrick Estate,* 19 D.&C.4th 360 (York Cty. 1993), is similarly distinguishable. It also did not involve any allegation of fraud in the procurement of the disclaimer. In fact, the *Pedrick* court specifically distinguished another case as inapplicable because it did involve fraud. *Id.* at 365 (distinguishing *Day's Estate,* 22 Fiduc. Rep. 662 (O.C. Delaware 1971) as a case involving fraud upon the disclaimant). In light of the facts of this case, it would be highly inequitable to allow the respondent to reap the benefit of her fraud by failing to set aside the disclaimer. Indeed,

other courts have set aside disclaimers to avoid an inequitable result.[40]

Although tangential to the issues before this court, mention of counsel's conduct is necessary. In this case, Mr. Schermer knew that the petitioner was unrepresented when he executed the disclaimer on December 7, 2002 and was aware through the brief telephone conversation in September 2002 that petitioner was impaired. Mr. Schermer claims that he believed the petitioner was intoxicated and the petitioner admits to having consumed alcohol on the occasion of the telephone conversation. Given the content of the conversation, irrespective of Mr. Schermer's version, it is clear that Mr. Schermer had a duty under Rule 4.3 of the Pennsylvania Rules of Professional Conduct[41] to advise petitioner, an unrepresented person, to retain counsel. Given Mr. Schermer's knowledge of petitioner's intellectual deficits, it was all the more imperative to do so. If the opportunity did not present itself in the telephone conversation, a subsequent letter should have been sent. The December 5 preparation of the two-page disclaimer directly facilitated the substantial and unforgivable acts of fraud which occurred in this matter and which might have been avoided had independent counsel been consulted by petitioner.

---

40. See *e.g., Days Estate,* 22 Fiduc. Rep. 662 (Del. Cty. O.C. 1971) (disclaimer procured by 'undue persuasion' set aside when unrepresented beneficiary repudiated it in timely fashion); *Stirk Estate,* 10 Fiduc. Rep. 623 (Del. Cty. O.C. 1960) (disclaimer made by child of decedent set aside where she was ignorant of her interests, unrepresented by counsel and the disclaimer was prepared by counsel for the decedent's other five children).

41. Rule 4.3 focuses on dealing with unrepresented persons.

## II. *To Prevent Future Wrongdoing, Danielle Stauffer Must Be Removed As Administratrix of the Estate of Edward Hydock III, Deceased*

Danielle Stauffer was in a confidential and trusted relationship with her father, the petitioner, and he relied on that relationship to his detriment. Since Danielle Stauffer has been found to have committed serious acts of fraud, this court cannot countenance permitting her to remain as the administratrix. Accordingly, in addition to the relief requested by petitioner, this court, pursuant to 20 Pa.C.S. §3182, also enters an order removing Danielle Stauffer as the administratrix[42] and refers this matter to the Register of Wills for appointment of a successor. Needless to say, the order further provides that all assets of the estate are frozen, that an account be prepared and that all records, statements and property of the estate be turned over to the successor administrator forthwith.

---

42. The present record more than suffices to justify removal of Ms. Stauffer as administratrix. See *Estate of Dobson,* 490 Pa. 476, 483 n.6, 417 A.2d 138, 142 n.6 (1980) ("Where a conflict of interest or self-dealing is apparent from the circumstances, there is no need to demonstrate that the fiduciary acted in bad faith or with fraudulent intent. Such a conflict of interest may also justify the removal of the executor.").